BRYAN CAVE LLP
1290 Avenue of the Americas
New York, New York  10104
(212) 541-2000
Robert A. Wolf (RW 3419)
James M. Altman (JA 7086)
Richard J. Schulman (RS 5512)
Rudyard W. Ceres (RC 4640)
*Special Litigation Counsel to Robert L. Geltzer, the
Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- x

| | |
|---|---|
| In re: | : **Chapter 7** |
| | : |
|     ASIA GLOBAL CROSSING LTD., *et al.*, | : **Case Nos. 02-15749 through 02-15750 (SMB)** |
|             Debtors. | : |
| | : **Jointly Administered** |

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- x

| | |
|---|---|
| ROBERT L. GELTZER, as Chapter 7 Trustee for ASIA GLOBAL CROSSING LTD. and ASIA GLOBAL CROSSING DEVELOPMENT CO., | : |
| | : |
|         Plaintiff, | : |
| | : |
|     v. | : **Adversary Proceeding No.** |
| | : |
| JOHN J. LEGERE; GARY WINNICK; LODWRICK M. COOK; JOHN M. SCANLON; THOMAS J. CASEY; LEO J. HINDERY, JR.; CARL GRIVNER; JOSE ANTONIO RIOS; DAN J. COHRS; JOSEPH P. PERRONE; STEFAN C. RIESENFELD; WILLIAM BARNEY; CHARLES F. CARROLL; EDWARD T. HIGASE; ALEXANDER NG; ANTHONY CHRISTIE; JOHN LOBIANCO; DAVID MILROY, and JOHN DOE #1 through JOHN DOE #10, | : **COMPLAINT** |
| | : |
| | : **JURY TRIAL DEMANDED** |
| | : |
|         Defendants. | : |

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- x

Robert L. Geltzer, the Chapter 7 Trustee (the "Trustee") of debtors Asia

Global Crossing Ltd. ("AGX") and Asia Global Crossing Development Co. ("AGCDC")

(collectively, the "Debtors"), by his Special Litigation Counsel, Bryan Cave LLP, as and

for his Complaint, alleges as follows against the above-captioned defendants

(collectively, "Defendants") based upon information and belief (gained from, among

other things, an investigation undertaken by counsel through examinations conducted

pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the review of public filings and available internal corporate documents and

records of the Debtors and other publicly available documents), except as to those

paragraphs concerning himself, which are alleged upon personal knowledge:

<u>**NATURE OF THE ACTION**</u>

1.     The Trustee brings this adversary proceeding (a) to recover damages

suffered by the Debtors as a result of numerous breaches of fiduciary duties to the

Debtors by certain of the Debtors' former directors and/or officers; (b) to recover certain

preferential transfers, post-petition transfers, and fraudulent conveyances made to several

insiders of the Debtors; (c) to deny, disallow, and/or equitably subordinate the claims of

such insiders filed against the Debtors' estates; and (d) to obtain related relief.

2.     The primary breaches of fiduciary duties by certain of the Debtors' former

directors and officers, each described in greater detail below, concern four sets of actions:

2.1     the participation of certain of the Debtors' former directors and/or

officers in a fraudulent scheme to inflate artificially and misreport to the public AGX's

earnings and other financial results in order to (a) enhance the financial results of the

Debtors and the Debtors' parent company, Global Crossing Ltd. ("Global Crossing"), and

2

(b) enhance the value of their investment in AGX and Global Crossing at the expense of the Debtors, coupled with the failure of certain of Debtors' former directors and/or officers to exercise due care in reviewing those public reports and in responding to a "whistleblower" complaint from Roy L. Olofson, a vice president of finance at Global Crossing, dated August 6, 2001 about, among other things, the misleading nature of AGX's public financial reports;

  2.2 the breaches by certain of AGX's former directors and/or officers of their fiduciary duties to AGX by, among other things:  (a) failing to provide to AGX's Board of Directors (the "AGX Board") relevant information regarding Global Crossing's financial condition throughout 2001, particularly as it related to the questions of whether, when, and in what amount AGX should draw down on an approximately $400 million ($400,000,000) subordinated credit facility from Global Crossing (the "GX Line of Credit"); and (b) failing to disclose to the AGX Board AGX's actual liquidity needs, in violation of their duty of loyalty to AGX, because they had a conflicting duty of loyalty to Global Crossing, as they were at the same time directors and/or officers of Global Crossing and/or had significant personal pecuniary interests in Global Crossing as a result of their substantial ownership of Global Crossing's stock or stock options;

  2.3 the breaches by certain of AGX's former directors (a) in October 2001, when they agreed to amend AGX's employment agreement with John J. Legere ("Legere"), then AGX's chief executive officer ("CEO"), in order to permit him to be Global Crossing's CEO while at the same time purporting to serve AGX, and (b) in January 2002, at which time they decided to terminate Legere as AGX's CEO without

3

cause so that he received substantial financial compensation from AGX, notwithstanding the numerous compelling reasons to terminate him for cause; and

2.4     the breaches by certain of AGX's former directors in making patently improvident business judgments during 2002 and 2003, even after they had been advised by counsel that AGX was in the "zone of insolvency," about compensation for the Debtors' employees by (a) adopting new forms of compensation for employees, such as a retention bonus plan and a severance plan; (b) enhancing and expanding the extent of then-existing change-in-control agreements; (c) accelerating and inflating the amounts of 2002 performance bonus payments: and (d) permitting the three highest-level management employees, defendants John M. Scanlon ("Scanlon"), Stefan C. Riesenfeld ("Riesenfeld"), and Charles F. Carroll ("Carroll"), to receive millions of dollars of income pursuant to illusory consulting agreements with Asia Netcom Corporation Limited ("Asia Netcom") at the same time as they were continuing to receive their full compensation from the Debtors, all of which, in the aggregate, created a stream of revenue for the Debtors' highest management employees that was well more than four times their existing salaries (which salaries ranged from $367,500 to $660,000 a year) at a time when Debtors were admittedly cash poor and/or insolvent.

3.     In addition to damages from these breaches of fiduciary duties, the Trustee seeks the recovery of millions of dollars resulting from preferential transfers, post-petition transfers, and fraudulent conveyances regarding compensation paid to the defendant officers in the form of, among other things:  (a) excessive 2002 performance bonuses paid on the basis of deliberately misreported and inaccurate numbers regarding AGX's financial performance, (b) retention bonuses specifically intended to evade the

C046038/0174188/1197160.1

reach of AGX's creditors; (c) special bonuses or other agreements to discharge

obligations to pay back loans to AGX and/or "gross-up" payments to cover certain tax

obligations resulting from forgiveness of such loans; and (d) special severance and

signing bonus payments.

### A.    Breaches of Fiduciary Duties Regarding Accounting Manipulation and Financial Misreporting

4.       Squandering AGX's business potential, the Financial Impropriety

Defendants (as defined below) -- including AGX's former inside directors and its highest

ranking executive officers -- operated AGX's business in a manner that was neither

financially sound nor economically viable.  Those Defendants -- Legere, Gary Winnick,

Lodwrick M. Cook, Scanlon, Thomas J. Casey, Leo J. Hindery, Jr., Dan Cohrs, Joseph P.

Perrone, Riesenfeld, William Barney, Edward T. Higase,  and Anthony Christie

(collectively, the "Financial Impropriety Defendants") -- included the most powerful men

at the helm of AGX.  Through their voting power on the AGX Board, their influence over

other AGX directors, and their power to hire, fire, supervise, and compensate other AGX

executives and employees, they determined AGX's business policies and they tightly

controlled AGX's business operations and its financial reporting.  The Financial

Impropriety Defendants did not focus AGX's business on transactions that would

generate genuine and adequate cash revenues.  Instead, they focused AGX's business on

transactions which did not generate much (if anything) in the way of current cash

revenues but, with the implementation of aggressive and improper accounting techniques

that contravened generally accepted accounting principles ("GAAP") and that assured

that financial statements would unfairly present AGX's actual financial results in material

C046038/0174188/1197160.1

respects, allowed AGX to report more substantial revenues and earnings than it actually realized.

5.        Toward that end, the Financial Impropriety Defendants contented themselves at first with AGX's focus on one particular type of transaction involving the lease of bandwidth capacity -- also known as indefeasible rights of use ("IRU") -- that was particularly susceptible to accounting abuse.  They then permitted the misapplication of GAAP in order to inflate artificially AGX's reported revenues and earnings.

6.        When the ability to manipulate the accounting results from those IRU transactions no longer appeared feasible, the Financial Impropriety Defendants adopted a different strategy.  Specifically, they caused AGX to engage in a variety of transactions, frequently close to the end of a financial reporting period, involving reciprocal leases of bandwidth capacity.  Called "swaps," those reciprocal transactions created illusory "accounting" revenues; and they did not provide AGX with true cash income, but they did provide the Financial Impropriety Defendants who were AGX employees with additional compensation.  Further, the only way those transactions even yielded "accounting" revenues was by violating GAAP.  Through those swaps, those Defendants created the false and deceptive impression that AGX was generating more revenue than in fact it was.

7.        To further enhance the false and deceptive impression that AGX was a growing and secure business, the Financial Impropriety Defendants caused AGX to develop and implement so-called "pro forma" metrics to describe its financial results. Because these measurements were in contravention of GAAP, they created an inaccurate and misleading portrayal of AGX's financial results.

C046038/0174188/1197160.1

8.      Despite a progressively more difficult cash flow environment, the Financial Impropriety Defendants failed to arrange a viable line of credit on which AGX might call if there were need to do so.  While AGX supposedly had the $400 million GX Line of Credit available to it, those Defendants (all of whom, at various times, were directors and/or officers of Global Crossing as well) knew, or should have known, that by early 2001 Global Crossing was unable to, and would not, furnish AGX with those funds if called upon to do so.  This left AGX without a financial safety net and, thus, vulnerable to financial collapse.

9.      By virtue of their wrongful activities, the Financial Impropriety Defendants were able to, and did, submit SEC filings, release financial statements and earnings reports, issue press releases, and make public statements that falsely depicted AGX as a growing and financially secure corporation.  They also improperly inflated the price of AGX's stock, thereby benefiting themselves financially.  Because Global Crossing included the financial results of AGX when accounting for Global Crossing's own financial results, this additionally influenced the financial results and stock price of Global Crossing.

10.     All of this allowed the Defendants who formerly were AGX directors to appear to justify levels of compensation and benefits for those Defendants who formerly were officers (as well as for other, non-defendant former employees of the Debtors) that were, in fact, unwarranted and to which they were not entitled.  It also permitted some of the Defendants to profit personally from the sale of Global Crossing stock at prices that were inflated as a result of their misconduct.

7

11.     When the truth emerged, it became clear that the Financial Impropriety
Defendants' wrongdoing had left AGX unable to continue in business. Indeed, because
of the depth of the insolvency caused by those Defendants' wrongdoing, AGX was
unable to reorganize and instead has been forced to liquidate.

**B.     Breaches of Fiduciary Duties Regarding
        AGX-Global Crossing Conflicts**

12.     From October through December 2001, AGX considered three major
issues which pitted the interests of AGX against the interests of its parent, Global
Crossing: (a) whether to merge AGX into Global Crossing; (b) whether to allow Legere,
AGX's CEO, simultaneously to serve Global Crossing as its CEO as well; and (c)
whether, when, and in what amount AGX should draw down on the $400 million GX
Line of Credit. In addressing these issues, almost all of AGX's directors at the time --
including, among others, defendants Legere, Winnick, Cook, Scanlon, and Casey -- faced
a conflict of interest between, on the one hand, their fiduciary duties to AGX and, on the
other hand, their fiduciary duty of loyalty to Global Crossing as Global Crossing directors
and/or, in some cases, their personal pecuniary interests in the financial well-being of
Global Crossing resulting from their substantial ownership of Global Crossing stock or
stock options. A number of other former AGX directors acknowledged that conflict of
interest and sought to resolve it by stepping down from the AGX Board on November 14,
2001. But, by then, they, along with the other directors who remained on the AGX Board
throughout the fall of 2001, had already breached their fiduciary duty by deciding to
allow Legere to act simultaneously as the CEO of both AGX and Global Crossing
starting in October 2001, at a time when AGX had to consider its liquidity needs in light
of a faltering market for its leases of IRUs and the possibility that it might get into a

8

confrontation with Global Crossing regarding AGX's draw down on the $400 million GX Line of Credit.

13.     For example, Legere, CEO of both AGX and Global Crossing, Winnick, Chairman of the Board of both companies, and Cook, Co-Chairman of the Board of both companies, breached their fiduciary duties to AGX during the period October 3, 2001 through January 2002 (if not before then) by: (i) concealing AGX's liquidity crisis from other AGX directors; and (ii) not disclosing the precarious financial condition of Global Crossing which existed from at least early 2001 and later become even more serious during the fall of 2001, when AGX was considering whether to draw down on the GX Line of Credit, as did those other Defendants who knew of Global Crossing's precarious financial condition by virtue of their individual director roles at Global Crossing.  As a result, AGX failed to make a formal demand upon Global Crossing for the $400 million until December 12, 2001, by which time Global Crossing was unable to satisfy that demand and refused it.

**C.     Breaches of Fiduciary Duties Regarding
        Legere's Employment and Compensation**

14.     By the late summer and early fall of 2001, AGX directors Legere and Winnick planned and decided to make Legere Global Crossing's CEO, even though, at the time, Legere had an exclusive employment arrangement with AGX.  Not only did the Defendants who were former AGX directors during that time breach their fiduciary duties to AGX in agreeing to release Legere from his exclusive commitment to AGX and allowing him to become simultaneously Global Crossing's CEO, but, as described in further detail below, they also breached their fiduciary duties by nearly tripling his cash compensation, from approximately $17 million over three years to approximately $45

9

million over that period of time, when they approved AGX's entry into a tripartite employment agreement with Legere and Global Crossing dated October 3, 2001. Then, in January 2002, the Defendants who were AGX directors at the time breached their fiduciary duties to AGX when, in terminating Legere as AGX's CEO, they failed to terminate him for cause or to force him to resign as a result of his patent conflict of interest in simultaneously serving as CEO of both Global Crossing and AGX and his numerous breaches of his fiduciary duties to AGX as its CEO and as a member of its Board. As a result of their breaches of fiduciary duties, they wrongfully agreed, in effect, to gift to Legere large sums of money, disguised as compensation, to which he was not entitled, such as severance pay in the amount of approximately $3.3 million and a performance bonus in the amount of $600,000.

**D.      Breaches of Fiduciary Duties Regarding Employee Compensation**

15.      Even prior to the time Global Crossing refused to honor AGX's demand to draw down on the $400 million GX Line of Credit, AGX faced liquidity problems. By no later than fall 2001, it was, in fact, insolvent. Nonetheless, AGX's directors throughout most of 2002 -- defendants Winnick, Cook, Scanlon, Grivner, and Rios, among others -- made sure that things got worse for AGX's financial prospects by the additional types and the greater amounts of compensation they accorded to AGX's management and even to AGX's non-executive employees. At a meeting in March 2002, the AGX Board decided to pay performance bonuses for 2001 based in part on AGX's financial performance, even though the results of such performance had been called into question by the AGX Audit Committee, which had commenced an investigation into financial misreporting in the years 2000 and 2001, and by AGX's outside counsel, who cautioned the AGX Board about the propriety of making such bonus payments based on

10

potentially inaccurate, if not intentionally misleading, data.  At the same time, the AGX

Board decided to accelerate the payment of annual 2002 performance bonuses to

employees, making (a) 40% of such annual bonuses payable in September 2002 (even

though they eventually were paid a month earlier) based upon improperly inflated

financial results for AGX in the first half of 2002, and (b) 60% of those bonuses payable

in March 2003 (even though they were ultimately paid two months earlier) based upon

improperly inflated financial results for AGX for the entire year.

16.    In March 2002, the AGX Board also approved a special retention bonus

plan for AGX executive officers and key employees, establishing a trust in Hong Kong

and causing the Debtors to make an approximately $7 million deposit into that trust in

May 2002 and to make an approximately $100,000 deposit into that trust in August 2002

with the intention of placing those funds beyond the reach of any AGX creditors and any

bankruptcy trustee.  As stated in materials presented to the Compensation Committee of

AGX's Board on July 18, 2002, the purpose of placing the $7.1 million into a trust was to

make the bonus payments "bankruptcy-proof."

17.    During the summer of 2002, the Board approved change-in-control

agreements for employees who had never before had such agreements and enhanced the

amount of the payments for other employees who already had such agreements.  In

September 2002, AGCDC adopted a new Severance Plan for employees.

18.    Then, in early November 2002, when the Debtors were preparing to file

their Chapter 11 petitions, the AGX Board was advised by defendant Scanlon, then

AGX's CEO, that he and defendant Riesenfeld, AGX's chief financial officer ("CFO"),

and defendant Carroll, AGX's General Counsel, had agreed to consulting agreements

11

with Asia Netcom, the contract vendee of substantially all of AGX's assets, under which

Scanlon, Riesenfeld, and Carroll were each to be paid more than the amount of their

respective annual salaries for consulting services that were illusory, while at the same

time continuing to draw their salaries from the Debtors.  Yet the Board never opposed

such consulting agreements, even though those agreements had been negotiated by those

management employees at the same time that they were negotiating the sale of AGX's

operating assets to Asia Netcom and thereby siphoned off money from Asia Netcom to

themselves that otherwise would have been paid by Asia Netcom to AGX when the sale

was consummated.

19.     As a result of providing these layers upon layers of various forms of

excessive compensation, the Defendants who were AGX directors during 2002 and early

2003 depleted the Debtors' dwindling cash reserves at a time when the Debtors were

insolvent.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 157 and § 1334.  By virtue of 28 U.S.C. § 157(a) and the July 10, 1984 Order of Robert

J. Ward of the United States District Court for the Southern District of New York, this

adversary proceeding is automatically referred to the United States Bankruptcy Court for

the Southern District of New York ("Bankruptcy Court").

21.     Certain of the claims asserted in this adversary proceeding are "core"

proceeding claims pursuant to 28 U.S.C. § 157(b)(2), including subsections (A), (B), (E),

(F), (H), and (O) thereof.  The remainder of the claims asserted in this adversary

proceeding are "non-core" proceeding claims which are related to the subject bankruptcy

C046038/0174188/1197160.1

cases under Title 11 of the United States Code.  With respect to all of the claims asserted

in this adversary proceeding, the Trustee consents: (i) to the entry of final orders and

judgments by the Bankruptcy Court pursuant to Bankruptcy Rule 7008; and (ii) to a jury

trial by the Bankruptcy Court pursuant to 28 U.S.C. § 157(e) and Bankruptcy

Rule 9015(b).

22.    The bases for the relief sought herein include relevant sections of

Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), including 11

U.S.C. §§ 502, 510, 541, 542, 544, 547, 548, 549 and 550, and pertinent non-Bankruptcy

Code law, including, without limitation, the Bermuda Companies Act 1981, California

Civil Code Sections 3439.04(a) and 3439.04(b) and federal common law (collectively,

"Applicable Non-Bankruptcy Law").

23.    Venue of the subject Chapter 7 cases and of this adversary proceeding is

proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

### A.    The Debtors and the Plaintiff

24.    Debtor AGX was incorporated under the laws of Bermuda on or about

September 24, 1999, and at one time maintained its principal place of business in

Hamilton, Bermuda.  At the times relevant to this adversary proceeding, AGX's

executive offices were located at 360 North Crescent Drive, Beverly Hills, California

90210, and then at Westway Gateway Building, 11150 Santa Monica Boulevard, Los

Angeles, California 90025.

25.    Debtor AGX was formed on or about September 24, 1999, as an indirect

wholly-owned subsidiary of Global Crossing.  On or about November 24, 1999, AGX

became a wholly-owned subsidiary of a joint venture among Global Crossing, Softbank

13

Corp. ("Softbank"), and Microsoft Corp. ("Microsoft") known as Asia Global Crossing

Holdings Ltd.  Subsequently, AGX became a public company in 2000 pursuant to an

Initial Public Offering more particularly described below.

26.     Debtor AGX was in the business of designing, constructing, and operating

a Pan-Asian fiber optic communications network which connected various terrestrial and

subsea cables, including those connecting Japan, Hong Kong, Taiwan, and Singapore to

each other and to the United States, as well as related services.

27.     Debtor AGCDC was incorporated under the laws of Delaware on or about

December 16, 1999.  It was formed as a direct, wholly-owned subsidiary of AGX.  At the

times relevant to this adversary proceeding, it did not engage in any substantive business

operations, but did provide certain administrative and payroll functions for AGX.  At the

times relevant to this adversary proceeding, its offices were located at 435 West

Commercial Street, East Rochester, NY 14445, at 360 N. Crescent Drive, Beverly Hills,

California 90210, and at Westway Gateway Building, 11150 Santa Monica Boulevard,

Los Angeles, California 90025.

28.     On November 17, 2002 (the "Petition Date"), AGX and AGCDC filed

their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C.

§ 101 *et seq.*, in this Court.

29.     In connection with that bankruptcy filing, on November 17, 2002, AGX

made a motion in its Chapter 11 case for this Court's approval of an agreement that it had

signed to sell substantially all of its operations and assets to Asia Netcom, a new

company organized by China Netcom (Hong Kong) Ltd. ("China Netcom").  The Court

granted that motion on or about December 10, 2002.

14

30.     On June 10, 2003, by Order of this Court, the Debtors' cases were converted to cases under Chapter 7 of the Bankruptcy Code and on June 13, 2003, Plaintiff Robert L. Geltzer ("Trustee") was appointed the interim trustee pursuant to 11 U.S.C. § 701 and thereafter became the trustee on a permanent basis pursuant to 11 U.S.C. § 702(d) and by operation of law and continues to serve as such.  The Trustee is a resident of the State of New York and is a licensed attorney maintaining an office at the Law Offices of Robert L. Geltzer, 1556 Third Avenue, Suite 505, New York, New York 10128.  He is qualified, among other things, to prosecute claims on behalf of the Debtors' estates.

**B.     Defendants**

31.     Defendant Legere was an AGX director from in or about April 2000 until in or about February 2002.  He was AGX's CEO from in or about February 2000 until on or about January 9, 2002.  At all times relevant to this Complaint, Leger was an "insider" of the Debtors, as such term is defined in Bankruptcy Code § 101(31).  During part of the time he was an AGX director, Legere also was a director of Global Crossing.  He was the CEO of both AGX and Global Crossing from on or about October 3, 2001 until on or about January 9, 2002, when he was terminated as AGX's CEO.  Since then, he has continued to serve as Global Crossing's CEO, a position that he still holds today.  Legere is an individual with a last known address of 680 Madison Avenue, Apt. 307, New York, NY 10021.

32.     Defendant Gary Winnick ("Winnick") was the founder and, from the time of AGX's incorporation until on or about September 23, 2002, a member and the Chairman of the AGX Board.  Winnick also served as an executive officer of AGX, with the title of "Chairman," from in or about May 2000 until on or about September 23, 2002.

15

At all times relevant to this Complaint, Winnick was an "insider" of the Debtors, as such

term is defined in Bankruptcy Code § 101(31).  Winnick was the founder of Global

Crossing and, at all times relevant to this Complaint, he had a substantial personal

pecuniary interest in Global Crossing as a result of his ownership of Global Crossing

stock and/or stock options.  During the entire time that he was an AGX director and

Chairman of the AGX Board, Winnick also was the Chairman or Co-Chairman of the

board of directors of, and a director of, Global Crossing.  Winnick is an individual with a

last known address of 1999 Avenue of the Stars, Fl. 39, Los Angeles, CA 90067-6049.

            33.     Defendant Lodwrick M. Cook ("Cook") was an AGX director and the Co-

Chairman of the AGX Board from in or about April 2000 until on or about September 23,

2002.  Cook also served as an executive officer of AGX with the title of "Co-Chairman"

from in or about May 2000 to in or about September 23, 2002.  At all times relevant to

this Complaint, Cook was an "insider" of the Debtors, as such term is defined in

Bankruptcy Code § 101(31).  During the entire time he was an AGX director, Cook also

was a director of Global Crossing and at first the Co-Chairman and later the Deputy

Chairman of its board.  At all times relevant to this Complaint, Cook had a substantial

personal pecuniary interest in Global Crossing as a result of his ownership of Global

Crossing stock and/or stock options.  Cook is an individual with a last known address of

13849 Weddington Street, Sherman Oaks, CA 91401.

            34.     Defendant Scanlon was an AGX director from in or about November 1999

until June 13, 2003.  Scanlon also served as AGX's CEO from in or about November

1999 until in or about February 2000 and then again from on or about January 9, 2002

until on or about June 13, 2003.  At all times relevant to this Complaint, Scanlon was an

"insider" of the Debtors, as such term is defined in Bankruptcy Code § 101(31).  In

addition, Scanlon was Global Crossing's CEO from in or about April 1998 until in or

about February 1999 and a Global Crossing director from in or about April 1998 until in

or about June 2001.  At all times relevant to this Complaint, Scanlon had a substantial

personal pecuniary interest in Global Crossing as a result of his ownership of Global

Crossing stock and/or stock options.  Scanlon is an individual with a last known address

of 30 Riverwood Road., N. Barrington, IL 60010.

35.     Defendant Thomas J. Casey ("Casey") was an AGX director from in or

about April 2000 until November 14, 2001.  Casey also served as an executive officer of

AGX with the title of "Director of Strategy and Business Development" from in or about

November 1999 until in or about December 2001, and with the title of "Vice Chairman"

of AGX from in or about May 2000 until in or about December 2001.  At all times

relevant to this Complaint, Casey was an "insider" of the Debtors, as such term is defined

in Bankruptcy Code § 101(31).  During the entire time he was an AGX director and

executive officer, Casey also was a director of Global Crossing and the Vice-Chairman of

its board.  He also was Global Crossing's CEO from in or about October 2000 until in or

about October 2001.  At all times relevant to this Complaint, he had a substantial

personal pecuniary interest in Global Crossing as a result of his ownership of Global

Crossing stock and/or stock options.  Casey is an individual with a last known address of

1495 Lands End Road, Manalapan, FL 33462.

36.     Defendant Leo J. Hindery, Jr. ("Hindery") was an AGX director from in

or about March 2000 until in or about October 2000.  At all times relevant to this

Complaint, Hindery was an "insider" of the Debtors, as such term is defined in

C046038/0174188/1197160.1

Bankruptcy Code § 101(31).  In addition, Hindery was a member of the Board of

Directors of Global Crossing from in or about March 2000 until in or about October

2000, and for all of that period was its chief executive officer.  At all times relevant to

this Complaint, he had a substantial personal pecuniary interest in Global Crossing as a

result of his ownership of Global Crossing stock and/or stock options.  Hindrey is an

individual with a last known address of 188 East 78th Street, Apt. 31B, New York, NY

10021-0406.

37.      Defendant Carl Grivner ("Grivner") was an AGX director from in or about

February 22, 2002 until on or about March 10, 2003.  Grivner is an individual with a last

known address of 4726 Westbury Court, Long Grove, IL 60047.

38.      Defendant Jose Antonio Rios ("Rios") was an AGX director from in or

about March 2002 until on or about March 10, 2003.  Rios is an individual with a last

known address of 19432 38th Court, Sunny Isles Beach, FL 33160.

39.      Defendant Dan J. Cohrs ("Cohrs") served as AGX's Senior Vice President

and Chief Financial Officer from in or about December 1999 until in or about May 2000.

During virtually that entire time, Cohrs also was the Senior Vice President and Chief

Financial Officer of Global Crossing.  Cohrs is an individual with a last known address of

5 Shields Lane, Darien, CT 06820.

40.      Defendant Joseph P. Perrone ("Perrone") served as AGX's Chief

Accounting Officer from in or about May 2000 until on or about March 26, 2002.

Perrone was also Senior Vice President of Finance for Global Crossing from in or about

May 2000 until in or about January 2001, when he became Global Crossing's Executive

Vice President, Finance and Business Performance.  Perrone left Global Crossing

18

sometime in or after November 2002.  Prior to his employment with Global Crossing and

AGX, Perrone was a partner with Arthur Andersen LLP ("Andersen"), auditors for both

Global Crossing and AGX.  Perrone is an individual with a last known address of 20

Island Trail, Sparta, NJ 07871-1602.

41.     Defendant Riesenfeld served as AGX's Senior Vice President and Chief

Financial Officer from in or about June 2000 until on or about June 13, 2003.  At all

times relevant to this Complaint, Riesenfeld was an "insider" of the Debtors, as that term

is defined in Bankruptcy Code § 101(31).  Reisenfeld is an individual with a last known

address of 1759 Glen Oaks Drive, Santa Barbara, CA 93108.

42.     Defendant William Barney ("Barney") served as AGX's President and

Chief Operating Officer from in or about January 2002 until on or about March 11, 2003.

Prior to that, Barney had served as AGX's President -- Business Services, from in or

about October 2001 until in or about January 2002.  At all times relevant to this

Complaint, Barney was an "insider" of the Debtors, as that term is defined in Bankruptcy

Code § 101(31).  Barney is an individual with a last known address of 23 Old Peak Road,

Dynasty Ct., T3, 37A, Hong Kong.

43.     Defendant Carroll served as AGX's Senior Vice President and General

Counsel from in or about March 2000 until on or about June 13, 2003.  At all times

relevant to this Complaint, Carroll was an "insider" of the Debtors, as that term is defined

in Bankruptcy Code § 101(31).  Carroll is an individual with a last known address of 335

Taintor Drive, Fairfield, CT 06890.

44.     Defendant Edward T. Higase ("Higase") served as AGX Vice President --

Carrier Services from in or about August 2000 until in or about December 2001, when he

left his employment with AGX to become Global Crossing's Executive Vice President, Carrier Sales and Marketing.  At all times relevant to this Complaint, Higase was an "insider" of the Debtors, as that term is defined in Bankruptcy Code § 101(31).  Higase is an individual with a last known address of 200 Park Avenue, Apt. 300, Florham Park, NJ 07932-1012.

45.    Defendant Alexander Ng ("Ng") served as AGX's Vice President, Greater China and Customer Care, from on or about May 9, 2000 until on or about March 31, 2002, when, following Legere, he left his employment with AGX to become a consultant to Global Crossing.  At all times relevant to this Complaint, Ng was an "insider" of the Debtors, as that term is defined in Bankruptcy Code § 101(31).  Ng is an individual with a last known address of 67-73 Worship Street, London EC2A 2DZ.

46.    Defendant Anthony Christie ("Christie") served as AGX's Vice President, Business Development and Strategic Planning, from in or about March 2000 until in or about December 2001.  Thereafter he was Global Crossing's Senior Vice President for Business Integration and Strategic Planning until in or about February 2002, when he became Global Crossing's Senior Vice President of Global Strategy and Business Integration.  He has been Global Crossing's Chief Marketing Officer and Executive Vice President from in or about November 2003 to the present.  At all times relevant to this Complaint, Christie was an "insider" of the Debtors, as that term is defined in Bankruptcy Code § 101(31).  Christie is an individual with a last known address of P.O. Box 494, Morris Plains, NJ 07950-0494.

47.    Defendant John LoBianco ("LoBianco") served as AGX's Vice President of Human Resources from in or about July 2000 until February 2002, when, following

Legere, he left his employment with AGX to become Global Crossing's Senior Vice

President, Employee Support and Development.  At all times relevant to this Complaint,

LoBianco was an "insider" of the Debtors, as that term is defined in Bankruptcy Code

§ 101(31).  Lobianco is an individual with a last known address of 90 Gregory Avenue,

West Orange, NJ 07052-4713.

48.     Defendant David Milroy ("Milroy") served as AGX's Managing Director,

Net Infrastructure Development from in or about September 2000 until on or about

March 10, 2003.  At all times relevant to this Complaint, Milroy was an "insider" of the

Debtors, as that term is defined in Bankruptcy Code § 101(31).  Milroy is an individual

with a last known address of 300 North Grenola Avenue, Pacific Palisades, CA 90272.

49.     Defendants John Doe #1 through John Doe #10 are fictitious names for

those individuals and/or entities against whom the Trustee may possess claims on behalf

of the Debtors' estates, but as to which claims the Trustee does not currently have

knowledge by virtue of the unjustified refusal, as described more particularly below, of

defendants Scanlon, Riesenfeld, and Carroll to turn over to the Trustee certain documents

properly belonging to the Debtors' estates which may reveal the existence of such claims

and the identity of the parties against whom such claims may be asserted.  The Trustee

reserves the right to amend this Complaint and the caption of this adversary proceeding

upon his ascertainment, through the turnover of such documents, of the existence of such

claims and of the true names of any "John Doe" defendants against whom such claims

may be asserted.

50.     During the respective periods on which they served on AGX's Board, the

Defendants who are former AGX directors -- Legere, Winnick, Cook, Scanlon, Casey,

21

and Hindery, for example -- controlled the AGX Board by virtue of their voting power and influence over the other directors. They breached their fiduciary duties to AGX, however, because they were motivated by their conflicting fiduciary duties to, and/or their personal pecuniary interest in Global Crossing.

51.     With respect to AGX's misreporting of its financial results to the public, the Financial Impropriety Defendants who were AGX directors during the period May 2000 (when AGX first filed with the United States Securities and Exchange Commission ("SEC") its S-1 Registration Statement) through October 24, 2002 (when AGX publicly restated its financial results for 2001), breached their fiduciary duties to AGX because, among other things:

51.1    Those Financial Impropriety Defendants did not require, as they should have done to discharge their fiduciary duties to AGX, that AGX focus its efforts on business that would generate real and adequate cash revenues. Instead, with their knowledge and assent, they allowed and encouraged AGX to engage in business transactions which did not generate much (if anything) in the way of current cash revenues but, with the implementation of aggressive and improper accounting techniques that contravened GAAP and resulted in financial statements which falsely presented AGX's financial results, caused AGX to report more substantial revenues and earnings than it actually realized.

51.2    With their knowledge and assent, those Financial Impropriety Defendants allowed, encouraged, and/or caused AGX to focus its efforts on leases of IRUs that were particularly susceptible to accounting abuse. They then permitted and, in

C046038/0174188/1197160.1

some cases, encouraged the misapplication of GAAP in order to inflate artificially

AGX's reported revenues and earnings.

51.3    When the ability to manipulate the accounting results from those

transactions no longer appeared possible, those Financial Impropriety Defendants

allowed, encouraged, and/or caused AGX, with their knowledge and assent, to enter into

a variety of transactions, frequently close to the end of a financial reporting period,

involving swaps.  Through accounting treatment and financial reporting that violated

GAAP, those transactions created illusory "accounting" revenues which did not provide

AGX with true cash income.

51.4    To enhance further the false impression that AGX was a growing

and secure business, those Financial Impropriety Defendants allowed the development

and use of "pro forma" measurements, such as "Cash Revenue," "Proportionate Cash

Revenue," "Adjusted EBITDA," and "Proportionate Adjusted EBITDA," to describe its

financial results.  As subsequently determined by the SEC, those non-GAAP metrics

created an inaccurate portrayal of AGX's financial results.

51.5    Though the cash flow environment at AGX became progressively

more difficult, those Financial Impropriety Defendants did not arrange for a viable line of

credit on which AGX might draw if there was a need to do so.  Rather, they relied on a

$400 million GX Line of Credit that by early 2001 they knew (since most of them at the

relevant time period also were Global Crossing directors) would not and could not be

honored.

51.6    Those Financial Impropriety Defendants signed and authorized

release of financial statements to the public that falsely portrayed AGX's true financial

results.  Many of those statements were included in false and misleading filings with the

SEC.

52.    The Financial Impropriety Defendants who former were AGX executive

officers -- Legere, Winnick, Cook, Scanlon, Casey, Cohrs, Perrone, Riesenfeld, Barney,

Higase, Ng, and Christie -- controlled AGX's business operations and financial reporting

to the SEC and the public.  Those Financial Impropriety Defendants took actions during

the respective periods during which they served as officers which violated their fiduciary

duties to AGX with respect to accounting manipulation and financial misreporting:

52.1    Those Financial Impropriety Defendants did this, among other

ways, by causing, facilitating and/or materially contributing to AGX's initial focus on

leases of IRUs, a particular type of transaction susceptible to accounting abuse, and then

improperly misapplying GAAP in order to inflate artificially AGX's reported revenues

and earnings.

52.2    Those Financial Impropriety Defendants caused, facilitated and/or

materially contributed to AGX's entering into numerous transactions (involving

reciprocal leases of IRUs commonly known as swaps) even though they had no business

substance or purpose and were intended solely to create illusory "accounting" revenues,

and the revenues from these reciprocal transactions were accounted for in a manner

which violated GAAP and had the effect of increasing artificially AGX's reported

revenues and earnings.

52.3    Those Financial Impropriety Defendants also caused, facilitated

and/or materially contributed to AGX's development and use of "pro forma" accounting

measurements to describe its financial results, even though those measurements

24

contravened GAAP and, therefore, created an inaccurate and misleading portrayal of AGX's financial results.

52.4    Those Financial Impropriety Defendants caused, facilitated and/or materially contributed to AGX's issuance of misleading financial statements which were disseminated to the public, reported on in false and misleading filings with the SEC, and made the subject of press releases and public statements.

53.    It is appropriate to treat the Financial Impropriety Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in AGX's public filings, press releases, and other public statements, as alleged in this Complaint, resulted from their individual or collective actions.[1/]    Those Defendants, by virtue of their governing and/or senior positions within AGX, controlled and/or directly participated in AGX's management, were directly involved in and/or oversaw AGX's business operations, and were privy to confidential proprietary information concerning AGX and its business, operations, prospects, growth, finances, and financial condition.  At all times relevant to this Complaint, the Financial Impropriety Defendants controlled AGX's business operations and financial reporting and, as a result of their breaches of fiduciary duties to AGX, made AGX into a vehicle for their personal pecuniary gain.

---

[1/]    Except as otherwise indicated by context, this Complaint refers to the actions of a Financial Impropriety Defendant only insofar as his actions were undertaken during the time such Defendant was an inside director and/or an executive officer of AGX.  Moreover, when the Complaint refers to the acts or conduct of the Financial Impropriety Defendants, it refers to the acts or conduct of one or more of those Defendants.

25

## FACTUAL BACKGROUND

A.    **Global Crossing Is Formed**

54.    Following passage of the federal Telecommunications Act of 1996 (the "Act"), a host of start-up telecommunication companies, such as Global Crossing, were formed to take advantage of the provisions of the Act.  Global Crossing, originally called Global Telesystems, was founded in or about March 1997 by defendant Winnick, who became its Chairman, and others.

55.    Global Crossing's original plan was to build an international fiber-optic telecommunications network and lease capacity on that network, starting with a trans-Atlantic cable.  Global Crossing's ultimate business plan was to be a "carrier's carrier" and sell capacity on its fiber-optic network to carriers who would, in turn, sell that capacity to end users or other carriers.

56.    Soon after its formation, Global Crossing designed and built global long distance telecommunications facilities and services, using a network of undersea digital fiber-optic cables and terrestrial backhaul capacity, segment by segment, starting with a transatlantic cable system called Atlantic Crossing ("AC-1"), a system connecting the United States and Europe; then Pacific Crossing ("PC-1"), a system connecting the United States and Asia; Mid-Atlantic Crossing ("MAC"), a system connecting the eastern United States, Bermuda, the Caribbean and Central America; and Pan American Crossing ("PAC"), a system connecting the western United States and Central America.  The cables making up that company's network were either laid on the ocean floor (subsea) or underground (terrestrial).

57.    Global Crossing's original business model was a modest one, not much different from that of a utility.  It planned to sell capacity on its network -- typically for

26

25-year periods -- and have those sale proceeds and the incidental service revenues generate the returns on its investment.  It had the capability of being a safe, conservative investment with predictable returns.

58.     Winnick's goals, however, were much grander.  He wanted to leverage the early success of fiber-optic networks into a telecommunications giant to create an opportunity for himself and other insiders, such as defendant Cook, to realize substantial personal wealth at the expense of Global Crossing and, ultimately, AGX.

59.     This initially required substantial financing to construct Global Crossing's network.  It then required substantial business growth and revenues in order to: (i) service both Global Crossing's debt and operating expenses; and (ii) build value for that company and its shareholders.

60.     To finance the construction of Global Crossing's fiber-optic cable system, over a period of just three years Global Crossing became a public company and raised more than $20 billion in the debt and equity markets.

**B.      Global Crossing Grows Largely Through Accounting Manipulations
(Which Were Later Utilized By AGX As Well)**

61.     To raise that much money in the debt and equity markets, and at the same time build value for Global Crossing and its shareholders, Global Crossing needed to create the impression that it was a tremendously successful, fast-growing company rather than a low-return, utility-like seller of cable space.  This would favorably influence Global Crossing's credit rating, and thereby allow further financing when needed.  It would also support and presumably increase the price of that company's stock.

62.     This was not easy to accomplish based solely upon Global Crossing's revenues and earnings from customary sales of network capacity.  Indeed, this became

27

even more difficult with the passage of time, as the amount of available bandwidth increased and, correspondingly, the price of bandwidth capacity decreased. So Global Crossing resorted to false and misleading public statements about its operational performance.

63.    Global Crossing did this at first by engaging in what otherwise might have been lawful transactions involving indefeasible rights of use ("IRU"), but then accounting for them in a way that: (a) violated GAAP; and (b) had the effect of making it appear as if those transactions were far more profitable on an immediate basis than they actually were.

64.    An IRU is a right to use a specified capacity, or bandwidth, over a designated communications cable owned by a telecommunications company for a set period of time. In an IRU transaction, the purchaser pays a set amount of money, usually up-front, and receives the right to use certain bandwidth for a particular period of time.

65.    Telecommunications companies typically enter into such transactions to fill gaps in their own networks or to provide a back-up in the event that sections of their own network experience trouble. While IRU transactions are not inherently misleading, Global Crossing, with the assistance of its auditors, structured these transactions from an accounting standpoint so that they artificially inflated Global Crossing's reported revenues.

66.    "Generally accepted accounting principles" are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Those principles are the official standards adopted by the American Institute of Certified Public

C046038/0174188/1197160.1

Accountants (the "AICPA"), a private professional association, through three successor

groups it established:  the Committee on Accounting Procedure, The Accounting

Principles Board ("APB"), and the Financial Accounting Standards Board ("FASB").

67.    Under GAAP, and particularly FASB Statement of Financial Accounting

Standard ("Statement" or "SFAS") No. 13, a company may account for certain kinds of

long term leases of equipment as sales, recognizing the entire value of the lease payments

due under the lease agreement immediately upon the execution of that agreement.  Under

FASB Statement No. 13, a lease of equipment can qualify as a sales-type lease if any one

of the following four criteria is met:  (a) the lease transfers ownership of the property to

the lessee by the end of the lease term; (b) the lease period extends for 75% or more of

the economic useful life of the leased asset; (c) the lessee is given the option to purchase

the leased asset at a bargain price at the expiration of the lease term; or (d) the present

value of the minimum lease payments, excluding executory costs such as insurance,

maintenance and taxes to be paid by the lessor, including any profit thereon, equals or

exceeds 90% of the fair value of the leased property.

68.    Any leases that do not qualify for sales-type treatment under FASB

Statement No. 13 are called "operating leases."  For operating leases, GAAP requires the

lessor to allocate the revenue generated by the lease agreement over the lease term, even

if the payments are made up-front.  Thus, under GAAP, if a lessor enters into an

operating lease for a term of 20 years, and the lessee pays all of the payments due under

the lease up-front, the lessor can recognize only $1/20^{th}$ of the payment as revenue for the

initial year of the lease term, and must book the balance of the payment as "deferred

C046038/0174188/1197160.1

revenue" and then recognize as revenue 1/20[th] of the payment in each of the remaining years of the lease term.

69.     FASB Statement No. 66, *Accounting for Sales of Real Estate*, states that if a seller sells property improvements and leases the underlying land to the buyer, the transactions are interdependent and it is impracticable to distinguish between profits on the sale of the improvements and the profits under the related lease. This section of the pronouncement applies directly to an IRU lease which is the combination of an equipment lease and an implicit lease of the underlying land.

70.     In addition, FASB Statement No. 98, *Accounting for Leases, Sales-Type Leases of Real Estate*, defines property improvements as any physical structure or equipment attached to the real estate that cannot be removed and used separately without incurring significant cost. SFAS No. 98 further states that a lease involving real estate shall be classified as a sales-type lease only if it meets the criterion of SFAS No. 13, paragraph 7(a), which says that in order to qualify as a capital lease, the lease must transfer ownership of the property to the lessee by the end of the lease term. SFAS No. 13 also states that if the original lease is an operating lease, then any sub-lease must also be classified as an operating lease.

71.     Global Crossing's network assets were integral to the underlying land. After AGX commenced operations, the same was true of AGX's network assets as well. Therefore, IRU leases should have been accounted for as real estate transactions. Because the underlying land leases were properly accounted for as operating leases and title to the land could not be transferred to another party, their IRU transactions should have been accounted for as operating leases.

30

72.     Although accounting for leases in accordance with GAAP is quite clear when the requirements of SFAS Nos. 13, 66 and 98 are considered, Global Crossing, and subsequently AGX, were not satisfied with their financial results when they complied with these accounting standards.  Instead, Global Crossing, and later certain of the Financial Impropriety Defendants, chose to ignore GAAP and classified IRU transactions as capital leases so that Global Crossing, and subsequently AGX, could record all the revenue immediately up-front.

73.     Ignoring generally accepted accounting principles, Global Crossing, and subsequently certain of the Financial Impropriety Defendants, improperly classified IRU transactions as sales-type leases.  This caused Global Crossing, and subsequently AGX, to recognize the entire value of the IRU transaction as revenue in the period when the sale was made (regardless of the fact that the IRU extended for a period of up to 25 years), while deferring the costs associated with the IRU over the entire period.

74.     By improperly accounting for IRU transactions as it did, Global Crossing, and subsequently AGX, under the guidance of certain of the Financial Impropriety Defendants, were able to inflate artificially those entities' (a) reported revenues and (b) reported earnings before interest, taxes, depreciation and amortization ("EBITDA"), giving the false impression in financial statements and SEC filings that they were generating far more revenue than they really were.

C.     **AGX Is Formed And Becomes A Public Company**

75.     As a means of raising more funds to continue the expansion of its operations, on or about September 24, 1999, Global Crossing formed AGX as an indirect wholly owned subsidiary for its Asian operations.

31

76.     On or about November 24, 1999, AGX became a wholly-owned subsidiary of a joint venture among Global Crossing, Softbank and Microsoft.

77.     AGX's business plan was to be a pan-Asian telecommunications carrier that provided integrated Internet, data, voice and web-hosting services to wholesale and business customers.

78.     On or about May 23, 2000, AGX filed with the SEC a registration statement on Form S-1 for the initial public offering ("IPO") of its common stock.

79.     As a result of the IPO, 68 million shares of AGX's common stock were sold to the investing public at an offering price of $7.00 per share, thus raising $476 million.  Another 500,000 shares were sold approximately one month later at $7.00 per share pursuant to the underwriters' over-allotment, thereby raising an additional $3.5 million.  The total proceeds from the sale of these securities consequently amounted to $479.5 million.

80.     Concurrently with the IPO, AGX also raised approximately $400 million through the sale of senior notes to certain underwriters of the IPO which, pursuant to a written agreement, were to be registered with the SEC so as to facilitate their sale to members of the investing public.

81.     In total, AGX sold over $875 million of securities to the investing public in or about 2000.

**D.      AGX Is Used As A Vehicle To Further The Interests Of Global Crossing**

82.     The spin off of Global Crossing's Asian operations to AGX was carefully structured to assure that Global Crossing maintained control of those operations.  At all times, Global Crossing owned a majority interest in AGX.  In addition, many of its directors and senior officers (some of whom are Defendants here) served in similar

32

positions at AGX.  For example, defendants Legere, Winnick, Cook, Scanlon, Casey, and

Hindery were AGX directors while they also served on the Board of Global Crossing;

defendant Legere was CEO of both AGX and Global Crossing simultaneously; defendant

Cohrs was CFO of both AGX and Global Crossing simultaneously; and defendant

Perrone was in charge of accounting at both AGX and Global Crossing simultaneously.

83.     Maintaining such control allowed Global Crossing to operate AGX in a

manner that served the best interests of Global Crossing and ultimately the personal

benefit of defendant Winnick and other Global Crossing insiders, such as defendants

Cook, Scanlon, Casey, Hindery, Cohrs, and Perrone, among others.

84.     Thus, Global Crossing included AGX in transactions intended primarily to

further the interests of Global Crossing.  For example:

84.1    In or about June-July 2001 Global Crossing sold AGX the Asian

operation of IXnet, Inc. and its parent, IPC Communications, Inc. ("IPC"), as well as the

territorial rights to Australia and New Zealand.  In or about November 2001, only six

months later, Global Crossing agreed to sell its IPC Trading Systems unit to an

investment group led by Goldman Sachs Capital Partners 2000.  As part of that

transaction, AGX divested the Asia-Pacific assets of IPC Trading Systems which AGX

had acquired as part of the acquisition of IXnet Asia from Global Crossing.

84.2    In 2001, Global Crossing arranged for numerous reciprocal leases

of network capacity (referred to as either "reciprocal transactions" or "swaps") with

AGX.  This included swaps directly between the two.  It also included three-way

transactions involving them and another telecommunications company.  These reciprocal

transactions had no legitimate business purpose.  However, by misapplying GAAP, such

33

transactions produced illusory "accounting" revenues for AGX and, directly or indirectly for Global Crossing as well, but no true GAAP revenues.

        84.3    In early October 2001, Global Crossing commenced merger discussions with AGX.  These discussions were called off a few weeks later, in mid-November 2001.

        84.4    AGX had the $400 million GX Line of Credit from Global Crossing, and, by reason of cash flow and other needs, had good reason to draw on the GX Line of Credit considerably earlier.  Yet, until the end of 2001 AGX failed to do so, notwithstanding the fact, well known and/or recklessly disregarded by many of the Financial Impropriety Defendants (since many of them also were directors and/or executive officers of Global Crossing simultaneously) that Global Crossing's financial condition during 2001 was becoming increasingly precarious, so that by late 2001 Global Crossing could not and, therefore, would not be able to honor the GX Line of Credit. Indeed, in June 2001, when Global Crossing requested a substantial line of credit from AGX for itself or one of its subsidiaries under certain conditions, the AGX Board was on notice of Global Crossing's own cash flow problems.  Nevertheless, the availability of the $400 million GX Line of Credit was constantly touted by AGX as a financing resource it could call upon.  When AGX was pressured by its security holders, both privately and publicly, to draw on that line of credit, a special committee of "independent" directors from the AGX Board was formed in mid-November 2001 and subsequently recommended that a request for funding under the GX Line of Credit be made to Global Crossing.  When, in December 2001, AGX finally made a formal demand

34

for funding from Global Crossing under the GX Line of Credit, Global Crossing refused to honor its obligation.

85.     Maintaining control over AGX also allowed Global Crossing to include the financial results of AGX in those reported by Global Crossing.

86.     This ability gave insiders at Global Crossing, such as defendants Winnick, Cook, Scanlon, Casey, Hindery, and Cohrs, among others, an incentive to maximize the reported revenues and earnings of AGX.  Doing so would positively influence the revenues and earnings reported by AGX and by Global Crossing, which would, in turn, help sustain and hopefully increase the value of both companies as well as the price of their stock and, thereby, purport to justify ever more generous compensation and benefits to Winnick and other Global Crossing officers and increase the value of Global Crossing stock for those Defendants who owned such stock or stock options.

87.     In order to maximize AGX's reported revenues and earnings, Global Crossing arranged for AGX to enter into the same kind of network capacity transactions as Global Crossing did, and then to engage in the same kind of accounting manipulations which Global Crossing developed concerning those transactions.

E.     **AGX Engages In IRU Transactions and Employs the Same Accounting Manipulations Used By Global Crossing**

88.     Initially, the main source of AGX's revenues was IRU transactions. During 2000, for instance, approximately 90% of AGX's annual revenue was attributable to IRU lease transactions.

89.     Like Global Crossing before it, AGX improperly accounted for these IRU transactions by incorrectly treating such transactions as sales-type leases, and recognizing the entire amount of the payments as immediate revenue.

C046038/0174188/1197160.1

90.     The egregious nature of these accounting manipulations was made all the more opprobrious by the fact that these accounting manipulations occurred even after FASB had adopted a pronouncement which made absolutely clear what should already have been obvious -- namely, that IRU lease transactions had to be treated as operating (and not sales-type) leases with the result that, if the entire lease amount was paid up-front, such revenues needed to be amortized over the period of the lease, which they were not.  Indeed, while Global Crossing felt compelled to reform its accounting treatment of IRU lease transactions, and substantially abandoned it by the end of 1999, AGX continued to employ the same improper accounting techniques through the end of 2000.

91.     The result of AGX's accounting manipulations was to inflate artificially AGX's reported revenues and EBITDA and to give the false impression in financial statements (and SEC filings) that AGX was generating far more revenue than it really was.

**F.    Global Crossing Switches To Swap Deals And AGX Follows Suit**

**(1)    FIN 43 And The Birth of The Swap Deal**

92.     In the fall of 1998, FASB published a proposed guideline that would prevent telecom companies from treating IRU lease transactions as sales-type leases and immediately recognizing revenue from such transactions under GAAP.

93.     Before that guideline was adopted, however, Perrone -- who was the partner then in charge of Global Crossing's account at Andersen, Global Crossing's outside accounting firm -- created another improper way by which Global Crossing and other telecommunications companies might recognize revenue growth -- namely, by exchanging like amounts of capacity in so-called swap transactions contrary to Accounting Principles Board Opinion No. 29 ("APB No. 29").

36

94.    APB No. 29, *Accounting for Nonmonetary Transactions*, sets forth the GAAP guidelines concerning accounting for transactions in which an asset is exchanged for another, nonmonetary asset.  Generally, under APB No. 29, the seller of an asset can record revenue based on the fair value of the asset received or given up, whichever is more reliably determinable.  For example, if a company sells a widget in exchange for an asset with a reliably determinable market value of $20,000, under APB No. 29 the exchange can be accounted for at the fair value of the widget received (namely, $20,000), for purposes of measuring gain or loss.  However, if the assets that are exchanged in the transaction are similar in nature, the exchange must be accounted for based on the cost basis, or book value, of the asset relinquished.  Thus, if the company sells its widget in exchange for another widget, the company cannot recognize any revenue in connection with that "sale" at all, because it has not realized any economic gain in the transaction.

95.    Nevertheless, Perrone concocted a scheme by which Global Crossing and other telecommunication clients of Andersen could realize revenue by exchanging network capacity among themselves, with each party treating the transaction as a "sale" by recording the transfer based on the fair value of the IRU it relinquished.

96.    According to pleadings filed in other lawsuits, such as *In re Global Crossing Ltds.*, Case No. 02-40188 (REG) (Bankr. Ct. S.D.N.Y.), and *In re Global Crossing Ltd. Securities Litigation*, Case No. 02 Civ. 910 (GEL) (S.D.N.Y.) (collectively, the "Other Lawsuits"), in a February 10, 1999 memo, Perrone recognized that APB No. 29 required companies to book the exchange of similar assets based on the book value of the asset relinquished, but suggested that Global Crossing might evade this requirement either by obscuring the reciprocal nature of the transactions (and thus making it look like

37

two separate sales for cash) or by making the network capacity appear sufficiently

"dissimilar" as to render the book value requirement in APB No. 29 inapplicable.

Perrone went so far as to identify the kinds of things that might suffice to create the

impression (even if false) that swaps were independent transactions rather than

reciprocal, dependent exchanges.  This included such things as:

- separate contracts,
- separate cash settlements,
- an independent determination of fair market value,
- justification for either party independently entering into the transaction, and
- contracts that were at least 60 days apart.

97.     Effective July 1, 1999, FASB issued FASB Interpretation No. 43 (or

"FIN 43"), an interpretation of FASB Statement No. 66, *Accounting for Sales of Real*

*Estate.*  FIN 43 provided further clarification of GAAP's requirements when accounting

for the sale of real estate.  It indicated that, for all sales after June 30, 1999, the definition

of "real estate" for purposes of GAAP would include any interests in property

improvements or integral equipment present on that property that could not be removed

and used separately from the real estate without incurring significant cost.  Therefore, in

order to qualify as a sale of real estate under GAAP, and thus to qualify for immediate

revenue recognition, there had to be an actual transfer of title, as opposed to merely a

transfer of use.

98.     As a result of FIN 43, there had to be a transfer of title of real estate, and

not just a transfer of use of the fiber-optic cable or some designated wavelength within

that cable, in order for an IRU transaction to qualify for immediate revenue recognition.

99.     Shortly thereafter, on or about September 30, 1999, Andersen published a

report entitled *Accounting by Providers of Telecommunications Network Capacity* (which

38

became known simply as the "White Paper") that was distributed widely among members of the telecom industry.

100.     According to pleadings filed in Other Lawsuits, the White Paper summarized FIN 43's requirement of a title transfer in order to qualify an IRU transaction as a sales-type transaction, but concluded that telecom firms could continue to recognize immediate revenue in connection with IRU lease transactions if they were papered properly.  The White Paper repeated Andersen's guidance, offered earlier to Global Crossing by Perrone, that telecom firms could book revenue simply by exchanging network capacity among themselves.  Andersen explained that network providers could exchange capacity in reciprocal transactions and recognize revenue based on the "fair value" of the capacity each party relinquished by carefully structuring the transaction. Indeed, during a two-day meeting in Chicago attended by Global Crossing and Andersen's other telecom clients, Andersen explained how to structure carefully an IRU swap with the specific intent of avoiding APB No. 29's requirement of accounting for the exchange of similar assets using the cost basis, or book value, of the assets exchanged. Notably absent from Andersen's guidance was any suggestion that the parties to an IRU swap disclose to the public the reciprocal nature of the carefully structured transaction, as required by law.

101.     After publication of the White Paper, Andersen and Global Crossing determined that Global Crossing could not transfer title in connection with an IRU transaction relating to land-based cable and, therefore, could not, under FIN 43, immediately recognize revenue on an IRU transaction where the cable was land-based. Nevertheless, Global Crossing continued to maintain that it could transfer title in

connection with an IRU transaction involving an ocean-based cable, because there was

no landowner of the seabed. Accordingly, Global Crossing determined that, following

July 1, 1999 (the effective date of FIN 43), it would not recognize GAAP revenue in

connection with IRU transactions relating to land-based (or terrestrial) cable, but that it

would continue to book immediately revenue in connection with IRU transactions

relating to oceanic cable.

102.    The fundamental problem with Global Crossing's response to FIN 43,

however, was that it ignored the economic realities of the IRU swap transactions and did

not properly apply APB No. 29, which should have precluded Global Crossing from

recording revenue on <u>any</u> IRU swap deal, terrestrial or subsea. Further, Global

Crossing's continued treatment of IRUs on subsea cables as sales type leases under

FASB Statement No. 13 continued the material, artificial inflation of Global Crossing's

revenue.

103.    In January 2000, Global Crossing abandoned any pretense of exchanging

different "kinds" of capacity, and commenced what it called a Global Network Offering

("GNO"). Capacity sold pursuant to Global Crossing's GNO was not permanently

designated capacity on any particular fiber, but was general capacity that allowed the

"purchaser" to use a certain unit of capacity anywhere on Global Crossing's global

network. The entire, but undisclosed, purpose of the GNO program was to facilitate

future swaps. By no longer requiring a particular physical section of the network to be

swapped, Global Crossing would, in effect, be trading rights of future use, similar to

options.

40

104.     Global Crossing's adoption of the GNO had two primary impacts from an accounting perspective.  First, by allowing the "purchaser" to direct capacity over any portion of its network, Global Crossing could no longer even pretend that it was selling a designated "asset."  Accordingly, even under the most liberal interpretation of FASB Statement No. 13, Global Crossing could no longer account for IRU transactions as sales-type leases.

105.     Second, because Global Crossing offered generic "capacity" as part of the GNO, any capacity it swapped with other telecommunications companies for GNO capacity was, by definition, similar to the capacity acquired.  As a result, Global Crossing's "Global Network Offering" heightened the requirement that that company record capacity exchanges using the book value pursuant to APB No. 29.

106.     The Financial Impropriety Defendants caused AGX to follow Global Crossing's example and adopt the same business approach and accounting practices.

107.     FIN 43 had a significant impact on Global Crossing's and AGX's financial statements.  Whatever rationale they previously employed to circumvent GAAP on the proper accounting treatment of IRU transactions disappeared with the promulgation of FIN 43.  Global Crossing and AGX could not book their IRU transactions as sales-type leases, and they could not record the fair market value of the IRU transactions entered into as revenue in the periods when the agreements were reached.  In addition, because a significant portion of Global Crossing's and AGX's reported revenue had been generated through IRU transactions and the practice of both companies (until they finally changed it) was to recognize immediately the income from those transactions up-front, compliance with FIN 43 caused a considerable drop in

41

reported revenues.  For example, AGX recognized GAAP revenue from IRU transactions in the amount of $138 million for the year ended December 31, 2000, as compared to $0 for the nine months ended September 31, 2001.  Amazingly, under the misguided leadership of those Financial Impropriety Defendants then associated with AGX, AGX continued to violate FIN 43 throughout 2000 by treating IRU transactions as sales-type leases, despite the fact that title did not pass to the lessee and even though Global Crossing had, in effect, discontinued that improper accounting treatment by the end of 1999.

108.    This precipitous drop in reported revenue from IRU transactions, however, still did not accurately reflect the true financial position of either Global Crossing or AGX.  Indeed, notwithstanding their purported adoption of FIN 43, Global Crossing and AGX still accounted for IRU swaps with other telecommunications companies using the fair value of the capacity exchanged, in violation of APB No. 29.  Their sole concession to the accounting rules followed by other public companies was that they no longer booked all of that revenue -- of which they should have been booking none -- immediately.  But Global Crossing and AGX soon devised another scheme to deal with that problem as well.

### (2)    Joseph Perrone Takes Over Accounting at Global Crossing And Asia Global Crossing

109.    On May 1, 2000, Global Crossing hired Perrone, who had served as the Andersen partner in charge of Global Crossing's account since 1997, as well as of the AGX account since AGX's formation in 1999 as Global Crossing's Senior Vice President in charge of finance.  At or around the same time, Perrone also became AGX's chief accounting officer.

42

110.     Perrone's employment package with Global Crossing was lavish.  It included a signing bonus of $2.5 million on top of an annual target bonus of $400,000, a base salary of $400,000, and stock options for 500,000 shares of stock.  Defendant Hindery, then Global Crossing's CEO, announced Perrone's hiring as follows:

> Joe Perrone has been in charge of our relationship with Arthur Andersen since before our IPO.  He has a financial understanding of our company and our industry which is second to none.  Joe is a recognized leader in communications financial reporting and accounting.  He will help us quickly install the financial reporting and administrative controls necessary for the most exciting company in telecommunications to be the best run company in its industry.

Six months after he was hired, Perrone was promoted to Executive Vice President in charge of finance for Global Crossing.

111.     When Perrone took over the finance department of Global Crossing, he moved the entire department from Beverly Hills, California to Madison, New Jersey.  Then, except for one individual, he fired every employee who previously worked in Beverly Hills, replacing the accounting staff with former colleagues whom he lured from Andersen with generous compensation packages, and ensuring that all accounting decisions and contact with Andersen went through him.

112.     AGX's accounting and finance needs were all handled by Global Crossing's finance department, headed by Perrone.  To facilitate this, and at the same time have someone in Global Crossing's finance department with authority over AGX's accounting and finance policies and practices, Winnick had Perrone installed as AGX's Chief Accounting Officer.

43

(3)    "Pro Forma" Measurements Are Utilized
As an Additional Accounting Manipulation

113.    Although Global Crossing, AGX, and Andersen had circumvented APB No. 29 and were recording the fair value of swapped revenue in violation of that rule, under FIN 43 they could not record all of the revenue immediately, as had been their practice.  To remedy this, Perrone and the telecommunications team at Andersen, along with Cohrs, created the concepts of "Cash Revenue" and "Adjusted EBITDA." Subsequently, Riesenfeld (AGX's CFO) developed the concepts of "Proportionate Cash Revenue" and "Proportionate Adjusted EBITDA."  Under the leadership of those Financial Impropriety Defendants then serving as AGX's directors and/or officers, AGX used these terms in its earnings disclosures.

114.    Global Crossing and AGX began to report the total "value" of the IRU transactions into which they entered in so-called "pro forma" disclosures that both companies portrayed as an accurate reflection of their financial performance.  Rather than advising investors to accept their GAAP reported revenues, Global Crossing and AGX concocted "pro forma" numbers by adding revenue -- which it defined as the "cash portion of deferred revenues" -- to reported revenues under GAAP.  They called this combined figure "Cash Revenue."  And, using the same method of calculation on their respective GAAP numbers, Global Crossing and AGX added in the deferred revenue from IRU transactions that did not qualify as GAAP revenue under FIN 43 to create what they called "Adjusted EBITDA," a figure which they again portrayed as an accurate reflection of their respective cash flows.

115.    The Financial Impropriety Defendants drafted, prepared, reviewed, and/or authorized SEC filings and earnings reports which defined "Proportionate Cash Revenue"

44

as, in the words of one earnings release (and similarly in other earnings releases and SEC filings), "the sum of the Asia Global Crossing ownership percentage of the Cash Revenue of Asia Global Crossing, Hutchison Global Crossing, Global Access Limited and other joint ventures after eliminating certain inter-company transactions. Cash Revenue which may be applied to any Global Crossing, Asia Global Crossing, or affiliated system is excluded." Proportionate Cash Revenue is not a GAAP term, but AGX presented this metric as an appropriate reflection of the economic results of its business, including its non-consolidated joint ventures. In fact, however, "Proportionate Cash Revenue" misleadingly added the cash portion of deferred revenue to GAAP revenue (which reflected revenue on an accrual, not a cash, basis) and, therefore, overstated AGX's actual cash flows from operations.

116.    The Financial Impropriety Defendants drafted, prepared, reviewed, and authorized SEC filings and earnings reports which defined the term "Proportionate Adjusted EBITDA" as, in the words of one earnings release (and similarly in other earnings releases and SEC filings), "the sum of the [AGX] ownership percentage of the Adjusted EBITDA of . . . Asia Global Crossing, Hutchison Global Crossing, Global Access Limited and other joint ventures after eliminating certain inter-company transactions." Although "Proportionate Adjusted EBITDA" is not a GAAP term, AGX misleadingly presented this pro forma metric as an appropriate reflection of its cash flows from operations, while hiding the truth about its true earnings and financial condition. In fact, the measurement was misleading since it actually double-counted some of the Company's already fictitious revenues.

45

117.    Statements that the Financial Impropriety Defendants caused, facilitated and/or allowed AGX to issue, to the effect that investors should rely on AGX's "pro forma" financial statements, were false and misleading for five principal reasons:

117.1   First, the Financial Impropriety Defendants developed and used "pro forma" disclosures which gave the false impression that these measurements reflected AGX's actual cash flow.  Those Defendants called revenue AGX supposedly generated through IRU swaps as "Cash Revenue," and defined "Cash Revenue" as "revenue plus the cash changes in deferred revenue."  However, in an IRU swap, AGX simply exchanged capacity for capacity.  Although AGX and its IRU swap partners would, in some instances, trade equal amounts of cash in a given transaction, AGX would realize absolutely no economic benefit in the transaction.  Thus, the use of the term "Cash Revenue" improperly gave investors a false impression that AGX's IRU swaps were generating cash, when in fact they were not.  Similarly, claiming that the number included "cash changes" in deferred revenues misrepresented that there was a positive cash flow component to the deferred revenue when there was no net gain in cash.

117.2   Second, those "pro forma" disclosures violated SEC Regulation S-X.  Regulation S-X requires that any financial statements issued by a company shall contain, in addition to the required disclosures, "such further material information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading."  AGX's financial statements that included the "pro forma" disclosures failed to disclose the following material facts:

46

117.2.1  That the IRU swaps essentially exchanged capacity for capacity and, as such, constituted non-monetary exchanges under APB No. 29; and

117.2.2  That the IRU transactions that AGX recorded as sales were, in fact, part of reciprocal transactions pursuant to which AGX was obligated to purchase a like amount of capacity with the same market value as the capacity sold.

117.3  Third, the "pro forma" disclosures were false and misleading because AGX's SEC filings and earnings reports in effect misrepresented to investors that AGX's "pro forma" disclosures would have complied with GAAP prior to the effective date of FIN 43.  The Financial Impropriety Defendants caused AGX to represent to investors in such SEC filings and earnings reports that AGX's "pro forma" disclosures were comparable to AGX's prior improper method of accounting in which it treated IRU transactions as sales-type leases under GAAP and recognized revenue from each IRU transaction in the period an agreement was made.  However, in calculating the "pro forma" numbers, AGX added in the amount it reported as deferred revenue (which constituted revenue it booked through IRU transactions but deferred over the length of the IRU lease pursuant to FIN 43) to AGX's reported GAAP revenue.  Because each IRU transaction included, in addition to the IRU itself, service obligations of AGX in connection with the cable, GAAP required that a portion of the revenue from each IRU transaction be recorded as "deferred revenue" even prior to FIN 43.  By simply including the entire amount received in each IRU transaction in AGX's pro forma "Cash Revenue,"

AGX included "revenue" in its pro forma disclosures that would not have qualified as revenue for GAAP purposes, even prior to the effective date of FIN 43.

117.4   <u>Fourth</u>, the use of the terms "Cash Revenue" and "Proportionate Cash Revenue" in documents AGX publicly filed was false and misleading because that usage gave investors the false impression that the pro forma figures disclosed by it reflected AGX's cash flow. According to AGX, "Cash Revenue" was comprised of its reported GAAP revenue plus the "cash portion of deferred revenue." Accepting this definition, AGX's use of the term "Cash Revenue" was false and misleading because the principal component -- GAAP revenue -- reflected revenue on an accrual, rather than a cash, basis. As a result, the term "Cash Revenue" did not accurately reflect AGX's cash flow.

117.5   <u>Fifth</u>, those pro forma measurements allowed AGX to flout the very purpose of FIN 43, which was to force the alignment of revenues and costs. Under the pro forma measurements, it again reported revenues immediately and amortized costs over the life of the capacity lease.

### (4)   The Swap Deals Flourish

118.   Legere, Winnick, and other Financial Impropriety Defendants enthusiastically bought into the use of swaps and the resulting freedom to continue misrepresenting AGX's financial picture to investors. Under Perrone's guidance, AGX's use of swaps developed and flourished. By the fourth quarter of 2000, AGX was regularly using swap transactions.

119.   The capacity obtained, however, was in many instances unnecessary from a business perspective. AGX often did not need or could not use all the capacity it acquired in swaps.

48

120.     Some of the capacity acquired through swaps could not even be connected without spending enormous sums of money.

121.     Sometimes, the swapped capacity was being sold by other companies at prices in excess of fair market value.  The swapped capacity was not sold at market prices.  As a result, swaps were not worth what AGX paid.

122.     In truth, swap transactions often had no valid business purpose.  The only reason for engaging in them was to boost artificially AGX's revenue at the end of each financial quarter as a means of meeting projected earnings.

123.     Swap transactions actually contributed no real revenues at all.  To the extent that a party paid monies to another telecom firm in connection with an IRU transaction, it received those monies back in connection with the reciprocal IRU transaction.

124.     Nevertheless, AGX continued to rely on swap transactions to appear to bridge the ever widening gaps between its respective actual and unrealistically high projected earnings.

125.     Consistent with the illegitimate purpose for engaging in them, a significant number of the IRU swap deals entered into by AGX were being done on or close to the last day of each quarterly reporting period.

126.     To encourage them to arrange swaps, sales people at AGX were paid <u>full</u> commissions on swap deals even though there were no real sales.  The justification for doing so was the need for swap deals to realize AGX's inflated quarterly projections.

### (5)     The Fraud Escalates And Deepens

127.     By the beginning of 2001, unbeknownst to the public, Global Crossing and AGX were facing difficult economic circumstances.  They had an abundance of

49

excess network capacity, but the prices for the capacity they could lease continued to fall.

The industry was not faring much better, as other telecommunication companies had

begun to file for bankruptcy.  Global Crossing and AGX failed to disclose the truth of

their respective financial conditions and just how close they were to becoming bankrupt

themselves.  Instead, Global Crossing and AGX continued to mislead the public that all

was well.

128.    Though swap activity did not contribute real revenues, there was internal

pressure at Global Crossing and AGX to continue engaging in such activity, to enable the

both companies to give the false impression that they were faring better than they actually

were.  As Patrick Joggerst (the former President of Carrier Sales at Global Crossing)

testified before Congress:

> It is my belief that the pressure to make the numbers became really the
> overriding factor in the company at the time.  The pressure was
> uncomfortable.  I can tell you myself, I remember the sales people literally
> did not sleep for several nights toward the end of a quarter, receiving
> phone calls.  I can recall in the case of the [360] Networks deal receiving
> many phone calls, including one from Tom Casey at about 11:35 the night
> before . . .  the quarter closed, making sure that the transaction with
> 360 Networks was done.

129.    Misreported swap transactions were so critical to meeting their financial

projections that Global Crossing and AGX placed considerable pressure on their sales

people to find such transactions (even if they had no real value), and did not tolerate

employees who failed to complete the transactions.  According to pleadings filed in Other

Lawsuits, an April 2, 2001 e-mail from Legere, then AGX's CEO, to Winnick, Casey,

Cook and Scanlon, described the model Legere was using to ensure that AGX's sales

people were making their numbers: "I assign very specific quotas to each sales leader and

then track attainment.  If someone significantly misses quota in one [quarter] they are put

50

on an improvement plan.  If they miss again they are let go.  It is very focused and

targeted."  Legrere concluded his e-mail:  "so you can see the focus we have on

delivering our share of the results as well."

### G.    AGX's Multiple Schemes To Inflate Artificially Its Financials

130.    Under the leadership of the Financial Impropriety Defendants, AGX

engaged in economically worthless, fraudulent swap transactions to make it appear as if

its business was growing and that it was generating revenues.  Some of these swaps even

involved AGX's affiliated companies such as Hutchison Global Crossing ("HGC"),

Pacific Crossing, Ltd. ("Pacific Crossing"), and IX Net.  Global Crossing and AGX

manipulated many of the swap transactions so that both companies could record and tout

sizeable revenues from the same deal -- sometimes referred to as "paired deals".

131.    What AGX reported to the public as supposed synergies created by the

operations of certain of its subsidiaries or affiliates, including Pacific Crossing, HGC, and

Global Access Limited ("GAL"), were actually capacity-swap agreements with other

telecom companies, including AGX's own affiliated companies.  According to pleadings

filed in Other Lawsuits, in an e-mail to Riesenfeld dated March 23, 2001, a manager of

the finance department at AGX aptly characterized the true, undisclosed relationship of

HGC and GAL:  "It occurs to me that we have create[d] our own little Asia Cable Club.

Its kinda like Qwest and GX buying from each other at the end of every quarter.  Now we

can do the same just within the affiliated group of companies!  We save HGC, HGC

saves us."

132.    In the first quarter of 2001, Global Crossing entered into two notorious

swap transactions with Qwest Communications International Inc. ("Qwest") (valued at

$105 million) and 360networks Corporation ("360networks") (valued at $200 million),

51

respectively.  However, internal AGX financial reports reveal that AGX itself recorded over $96 million of "Proportionate Cash Revenue" and over $119 million of cash revenue from the Global Crossing/Qwest swap, and over $52 million of "Proportionate Cash Revenue" and $95 million of Cash Revenue from the Global Crossing/360networks swap.  Thus, the total impact to AGX's financial results from those two Global Crossing transactions alone was the recording of over $148.2 million as "Proportionate Cash Revenue" and over $214.9 million as cash revenue in first quarter 2001.  Although this revenue was included in its first quarter 2001 financial statements provided to the public, AGX never received any of this reported revenue.

133.   AGX continued to record revenue from paired deals for the second quarter of 2001 to the tune of $126.4 million and $208 million in "Proportionate Cash Revenue" and "Cash Revenue," respectively, from swaps between Global Crossing and Qwest, Cable & Wireless PLC ("Cable & Wireless"), FLAG Telecom Group Limited ("FLAG Telecom"), DACOM Corporation ("DACOM") and China Network Communications Group Corp. ("China NetCom").

134.   In the third quarter of 2001, AGX recognized $32.7 million and $38.7 million in "Proportionate Cash Revenue" and "Cash Revenue," respectively, for swap deals between Global Crossing and other third parties including FLAG Telecom, SITA Equant SC ("SITA Equant"), Hanaro Telecom, Inc. ("Hanaro"), New World Telecommunications Limited ("New World Telecom") and iAdvantage Limited.

135.   Finally, in the fourth quarter of 2001, AGX recognized $43.4 million and over $50.5 million in "Proportionate Cash Revenue" and "Cash Revenue," respectively, for swap deals involving China NetCom, WorldCom Inc. ("WorldCom"), Taiwan Fixed

C046038/0174188/1197160.1

Network ("TFN"), and DACOM Crossing and/or Hanaro.  Once again, AGX never received any of this reported revenue.

136.    Asia Global Crossing omitted key details of the paired deals from information disclosed to the public.  According to pleadings filed in Other Lawsuits, in an e-mail dated July 27, 2001 from Cliff Chau, then AGX's Director of Accounting, to Riesenfeld and other AGX employees, Chau wrote:

> I believe that we need to make some disclosure regarding the paired deals in the earnings release.  I had a discussion with Mark Fagan, our AA [Andersen] audit partner.  He is comfortable if we make no less disclosure than what [Global Crossing] did in Q1 . . . .  In terms of exact wordings, I think Stefan [Riesenfeld] will be the master.  I believe we had disclosure of category I transactions in Q1.  We do not need any disclosure for category II (AA agreed already).  We should follow [Global Crossing] disclosure for category III (true paired transactions).

137.    Like Global Crossing, AGX used the phrase "revenue shredding" to describe the method which was used to allocate revenue generated from leases and swaps of network capacity to their operating subsidiaries and third party system owners.  In what amounted to a shell game with their reported revenue, they allocated revenue between various subsidiaries and affiliated companies so that they could double-count the revenues.

138.    In addition, just as Global Crossing had abandoned any pretense of exchanging different "kinds" of capacity by selling GNOs, AGX similarly sold GNOs as Asia Network Offers ("ANOs").  As with Global Crossing, these ANOs were intended to facilitate swaps, which could be used to artificially inflate AGX's revenues and earnings.

139.    Aside from the paired deals and ANOs, AGX also entered into its own swap deals for which there was no business purpose and for which AGX improperly recorded and touted revenues.  According to AGX internal reports alleged in Other

C046038/0174188/1197160.1

Lawsuits, in the fourth quarter of 2000, AGX had swap deals with, among others: 360networks ($21 million); Teleglobe International Holdings Ltd. ($12.6 million); Sea Tel Inc. ($11.2 million); Deutsche Telekom AG ($11 million); Nippon Telegraph and Telephone ("NTT") ($10 million); and DACOM ($1.8 million).  Thus, swap deals accounted for 37.9% of AGX's cash revenues that quarter.  During this same period, total GAAP revenue was only $22.3 million.  In the first quarter of 2001, AGX had swap deals with:  Cross Wave Communications Inc. ($25 million); SITA Equant ($5.3 million); DACOM ($3.78 million); Digital Island Inc. ($6.2 million); and TFN ($5.5 mil.).  In the second quarter of 2001, AGX had swap deals with, among others, DACOM ($4 million). For the third quarter of 2001, AGX had swap deals with other companies including China NetCom ($45 million); FLAG Telecom ($15 million); Hanaro ($12 million); SITA Equant ($7.4 million); TFN ($3.1 million); and New World Telecom ($2.3 million).  For the nine months ended September 30, 2001, AGX recorded over $380.8 million in cash revenue from swap deals, or 61.7% of its total cash revenues.  In contrast, GAAP revenue for this period was only $74.8 million, thus illustrating the misleading nature of AGX's pro forma measurements.

140.    These deals did not go unnoticed within AGX, as evidenced by the following series of emails quoted in pleadings in the Other Lawsuits.

140.1   In a June 12, 2001 e-mail from defendant Higase to various AGX employees providing a "swap update," Higase revealed that AGX entered into a swap with DACOM for $4 million for a Seoul to Tokyo route and attempted to effectuate a "cashless" deal with Cable & Wireless and Flag Telecom on a Singapore to Hong Kong route.  In another e-mail from Higase to Legere and others at AGX dated June 12, 2001

54

regarding "Swap potential on Flag/EAC," Higase advised that he had a call with Flag

Telecom for a potential swap deal worth $30-35 million.  Higase conceded that even

though AGX and Flag had been negotiating the swap, he had not yet ascertained how

AGX would use the capacity.  Legere responded on June 13, 2001 requesting that Higase

keep him apprised on the deal's progress.  Legere did not question or admonish the use of

swaps; he personally participated in some of them and promoted and encouraged others

to accomplish them.

      140.2   On August 6, 2001, Higase sent an e-mail concerning a $15-20

million swap with Nava Networks Pty Limited ("Nava") whereby AGX would purchase

capacity from Nava and Nava would then pay the "same amount on installation and

maintenance contract."  In the e-mail, Higase suggested that instead of having AGX sign

the capacity agreement with Nava, the Company use one of its subsidiaries (GAL) as a

"signing agent."  The following day, after concern over the structure of the agreement

was expressed, Riesenfeld added in an e-mail to Higase:  "I'll work this a bit more, but as

I said in Hong Kong it doesn't feel right and probably won't pass the test.  It seems

wrong to get GAL into the middle of something they have no connection with -- both on

accounting grounds and operational grounds."

      140.3   On August 9, 2001 Simon Clayton-Mitchell, an AGX employee,

sent an e-mail to Riesenfeld following a meeting that took place earlier that day involving

AGX's financial statements.  Obviously confused about AGX's financial statements

despite the meeting, Clayton-Mitchell asked Riesenfeld a series of questions, including

an inquiry as to how much money AGX "actually receive[d] as cash in the bank"

compared with the "Proportionate Cash Revenue" reported to the public, and an inquiry

as to what percentage of AGX's reported "Proportionate Cash Revenue" Global Crossing

received with purchases of capacity on other systems.  Riesenfeld began his response by

trying to convince Clayton-Mitchell that "[t]he premise is that purchases are different

from sales.  You get the cash for all the sales.  You may then use some of it to buy

capacity."  Riesenfeld falsely told Clayton-Mitchell that:  "In this context, we received

cash for all sales."  With respect to the AGX/Global Crossing revenue appropriation,

Riesenfeld responded:  "I won't debate coincidence vs. causality.  There is no question

that [Global Crossing] has bought a lot from the carriers who purchased on our network,

both in the quarter they made the purchase on our network, and I am sure in other

quarters.  Big carriers do buy stuff from each other."  Clayton-Mitchell was not satisfied

with Riesenfeld's responses.  He began his own response by writing:

> My point at the meeting was that we were taking cash in and sending it
> back out the door -- which [Asia Global Crossing] did, to the tune of 39%
> of revenues (CSFB described transactions within [Global Crossing] of
> 21% of their total revenues as "huge").  Additionally, [Global Crossing]
> provided another 50% of our revenues -- yes, I agree, cash to us -- via
> swap transactions.  I do believe that this goes to the heart of Charlie's
> issue -- Quality of Earnings! Real demand was small -- less than 10% of
> our revenues.

140.4   Clayton-Mitchell then asked Riesenfeld how much capacity on

AGX's PC-1 cable was needed to be sold to pay off the cost of the construction of the

cable.  After Riesenfeld advised him that AGX needed to sell "almost all of it (89$^{\%}$+),

Clayton-Mitchell responded:  "That is ugly -- our original thinking was 25% -- 33%

would cover the cost of construction."  Riesenfeld wrote back:  "A face only a mother

could love."

**H.**     **A Whistleblower Emerges -- Only To Be Squelched**

141.     While it was concealed from the public for another six months, on or about August 6, 2001, Roy Olofson, Global Crossing's Vice President of Finance, took the extraordinary step of notifying James C. Gorton ("Gorton"), Global Crossing's General Counsel and Chief Ethics Officer, of the accounting fraud taking place at both Global Crossing and AGX.  As Vice President of Finance, Olofson was responsible for Global Crossing's accounting and financial reporting functions.

142.     Olofson, who joined Global Crossing in 1998 with over 28 years of senior financial management experience, wrote the letter after returning from a 3-month medical leave between March and May 2001.  Olofson later testified at Congressional hearings that, while on leave, he "learned that Global [Crossing] was having a very difficult time meeting its first quarter revenue projections.  I later learned that Global [Crossing] ultimately was able to meet its numbers in part due to some large, last-minute swap transactions."  In May and June 2001, Olofson expressed his concern to Perrone about the manner in which Global Crossing was accounting for swaps.  Perrone told Olofson only that Global Crossing was "getting out of the IRU business."

143.     Olofson told Congress that his subsequent review of sales reports showed that approximately 13 of the 18 largest IRU transactions completed in the second quarter of 2001 "were last minute swaps where identical or substantially identical amounts of cash were being exchanged along with the underlying capacity."

144.     After defendant Casey, Global Crossing's CEO, deceived the participants in an analyst conference call for the second quarter by telling them that there had been no swaps in that quarter, a false statement that he had previously told the analysts during the

first quarter conference call, Olofson wrote a letter to Gorton dated August 6, 2001

outlining his concerns (the "Whistleblower Letter").

145.    In the Whistleblower Letter, Olofson told Gorton that he was "very

disturbed" by information he had received regarding certain "accounting and financial

reporting matters" at both Global Crossing and AGX, and was "concerned that investors

and commercial bankers may have been intentionally misled about [Global Crossing's

and AGX's] reported Cash Revenues, Adjusted EBITDA, Net Earnings, etc. during the

three quarters ended June 30, 2001."  The Whistleblower Letter focused on three areas of

concern:  (a) "Cash Revenue and Adjusted EBITDA of Global Crossing, and

Proportionate Cash Revenue and Proportionate Adjusted EBITDA of Asia Global

Crossing, are not measures of cash receipts or earnings and are misleading;"

(b) "Amounts reported as Cash Revenues and Adjusted EBITDA may have been falsely

inflated by 1) including amounts for which cash had not been received, and 2) structuring

swaps or non-monetary exchange of capacity as cash transactions by 'round tripping'

cash;" and (c) "Certain expense accounting matters."

146.    With respect to the first area of concern, Olofson advised that Global

Crossing had created two non-GAAP, pro forma measurements, Cash Revenue and

Adjusted EBITDA, supposedly to show what Global Crossing's revenues would be had

the change in accounting for IRUs not occurred.  Global Crossing used the pro forma

measurements as a means to tout its financial results.  As an example, Olofson cited the

headline of Global Crossing's earnings announcement for the first quarter of 2001 which

read:  "Global Crossing's Pro Forma Recurring Adjusted EBITDA up 43% and Pro

Forma Cash Revenue up 39% from first quarter of 2000." Olofson then detailed several reasons why these numbers were misleading.

147.    The term "Cash Revenue" was misleading, according to Olofson, because it (a) did not actually measure cash receipts, and (b) was not confined to revenue for the period involved. So too was the term "Adjusted EBITDA," since it included revenues that were not earned during the period involved, and gave no consideration to costs to be incurred in other periods for those revenues. Explained Olofson:

What do these metrics mean?

Cash Revenue-

a.    Is it cash? No. The underlying GAAP Revenue is on the accrual basis of accounting. To arrive at "cash" the underlying GAAP Revenue must be adjusted for changes in accounts receivable giving rise to the GAAP Revenue. Consequently "Cash Revenue" is not the measure of cash receipts it is purported to be.

b.    Is it Revenue for the period being reported? Originally it was intended to be a measurement of GAAP Revenue as it would have been calculated prior to the issuance of FIN 43. Inasmuch as other types of future service revenue and cash receipts from sales in prior periods may now be included in Cash Revenue it is no longer consistent with the original concept and would not be considered "Revenue" for the period.

Adjusted EBITDA -

a.    <u>Earnings</u> before Interest, Taxes, Depreciation, and Amortization (EBITDA) is a measure of cash flow earnings before certain expense items. Adjusting EBITDA for the "change in cash Deferred Revenue" from IRU sales was consistent with the original concept of Cash Revenue noted above in 1.b. This theory falls apart when "cash deferred revenues" for future services and payments from sales in prior periods are included because such revenues are not <u>earned</u> during the period. They will be earned when the service is provided. Furthermore, there is no consideration given to future out-of-pocket costs to perform such services. For example, Asia Global Crossing's earnings release for the quarter ended June 30, 2001 indicates that $50.1 million in prepayments for future services are included in Cash Revenue and

> Adjusted EBITDA.  The Company may have received a cash
> prepayment but it is not "Revenue" and it is not "Earnings."

148.    Since AGX also used these pro forma measurements, as well as two

others, and, like Global Crossing, focused on these pro forma measurements in its

earnings announcements, Olofson's concern extended equally to AGX.  In fact, the first

listed concern specially mentioned AGX's use of misleading pro forma measurements

when reporting its financial results.  Further, when explaining that the term "Adjusted

EBITDA" was misleading because, among other things, no consideration was given in

that metric to future out-of-pocket costs to perform future services, Olofson cited as an

example AGX's earnings release for the quarter ended June 30, 2001.

> For example, Asia Global Crossing's earnings release for the quarter
> ended June 30, 2001 indicates that $50.1 million in prepayments for future
> services are included in Cash Revenue and Adjusted EBITDA.  The
> Company may have received a cash prepayment but it is not "Revenue"
> and it is not "Earnings."

149.    As regards the second area of concern, Olofson told Gorton that the Cash

Revenue and Adjusted EBITDA figures used by Global Crossing in its financial

statements and earnings releases were inflated because they included cash deferred

revenue "from transactions other than IRU sales that would not have been reported as

GAAP revenue prior to the issuance of FIN 43."

150.    Beyond this, Olofson also observed that these pro forma measurements

were inflated by reason of swaps or non-monetary exchanges of capacity being structured

as cash transactions by "round tripping" the cash.  Observed Olofson:

> It also appears that many IRU sales during the first and second quarters of
> 2001 are conditioned upon the company having to buy capacity from the
> customer.  It appears that certain transactions may have been structured as
> cash transactions rather than swaps or non-monetary exchanges to show
> greater amounts of Cash Revenue and Adjusted EBITDA.  By having the
> cash change hands ("round tripped") it appears that the "sale" is

60

generating positive cash flows.  Furthermore the capital expenditure is ignored.  It is a win-win for both parties to the transaction because they can each show positive "Cash Revenue" and "Adjusted EBITDA" and their cash balances remain the same.  The only negative is that the "purchase" increases capital expenditures.  These types of transactions must raise questions about pricing and possibly the use of the acquired capacity.

I have been told that over 80 percent of the change in cash deferred revenues in the first two quarters of 2001 resulted from swaps or non-monetary exchanges for which the cash may have been "round tripped" (There may be one transaction in the quarter ended March 31, 2001 where the gross amount of the sale transaction was included in cash deferred revenue although only the net amount of cash changed hands.) In other words, less than 20 percent of the change in cash deferred revenue is new cash that the company can use to pay down debt or fund operating expenses.  As you know these amounts became so material in the quarters ended March 31 and June 30, 2001 that the earnings release contains language describing certain purchase commitments in the quarters.

151.    Once more, this concern applied equally to AGX, because the Financial Impropriety Defendants, following Global Crossing's lead, were similarly causing, facilitating, and/or allowing AGX to engage in swaps and non-monetary exchanges of capacity that were structured as cash transactions by "round tripping" the cash.

152.    After Gorton received the Whistleblower Letter, he wrote back to Olofson on August 7, 2001, assuring him that his concerns would be fully investigated and asking him to keep his concerns confidential.  However, Gorton did not fully investigate Olofson's concerns.  Although Gorton engaged Simpson Thacher & Bartlett ("Simpson Thacher"), a New York City law firm where he had been a partner, to investigate Olofson's claims, Simpson Thacher neither spoke with Olofson, nor the directors of Global Crossing or AGX about Olofson's claims.  The law firm instead accepted management's assurance that the issues already had been discussed with Andersen.  Remarkably, Olofson was never even interviewed.

61

153.    Since the Whistleblower Letter raised issues of serious concern for AGX, it was distributed to Legere, then AGX's CEO; Riesenfeld, AGX's CFO; and Carroll, AGX's General Counsel.  Although each owed fiduciary duties to AGX, and although none of them professed the accounting expertise to evaluate the validity of Olofson's allegations, for at least the next five months none of them took any steps to investigate or evaluate the substance of those allegations and their implications for AGX.  None of them discussed the substance of the Whistleblower Letter or its implications for AGX's financial reporting with AGX's Chief Accounting Officer, Perrone, or with members of AGX's Audit Committee.

**I.    AGX Issues False Financial Statements, Files False
SEC Reports, Releases False Financial Information And
Makes False Public Statements**

154.    Throughout the course of AGX's business life, the Financial Impropriety Defendants caused and/or allowed AGX to issue misleading financial statements, file misleading SEC reports, release misleading financial information, and make other misleading public statements.  These included, among others: (a) AGX's Form S-1 Registration Statement filed with the SEC on or about May 23, 2000, as amended on July 13, 2000, August 7, 2000, September 5, 2000, September 27, 2000, October 3, 2000, October 5, 2000, and October 6, 2000, and signed by or on behalf of Legere, Winnick, Cook, Scanlon, Casey, Hindery, Cohrs, and Riesenfeld, among others; (b) AGX's November 8, 2000 Earnings Release; (c) AGX's Form 10-Q for the Third Quarter of 2000, filed with the SEC on or about November 20, 2000 and signed by Riesenfeld; (d) AGX's Form S-4 Registration Statement filed with the SEC on or about January 20, 2001, as amended on February 9, 2001, regarding AGX Senior Notes due October 15, 2001, and signed by Legere, Winnick, Cook, Scanlon, Casey, and Riesenfeld, among

62

others; (e) AGX's February 12, 2001 Earnings Release, in which Legere was quoted; (f)

AGX's 2000 Annual Report on Form 10-K, filed with the SEC on or about April 2, 2001

and signed by Legere, Winnick, Cook, Scanlon, Casey, and Riesenfeld, among others;

(g) AGX's April 27, 2001 proxy statement on Schedule 14A for its 2001 annual

shareholder meeting; (h) AGX's S-8 Registration Statement relating to the company's

Stock Incentive Plan, filed with the SEC on or about April 27, 2001 and signed by

Legere, Winnick, Cook, Scanlon, Casey, and Riesenfeld, among others; (i) AGX's May

2, 2001 Earnings Release, in which Legere was quoted; (j) AGX's Form 10-Q for the

First Quarter of 2001, filed with the SEC on or about May 10, 2001 and signed by

Riesenfeld; (k) statements made by Legere in several interviews with the financial press

in or about June 2001; (l) AGX's August 1, 2001 Earnings Release, in which Legere was

quoted; (m) AGX's Form 10-Q for the Second Quarter of 2001, filed with the SEC on or

about August 14, 2001 and signed by Riesenfeld; (n) AGX's October 4, 2001 press

release and related Form 8-K, filed with the SEC on or about October 5, 2001, and signed

by Riesenfeld, announcing merger discussions between Global Crossing and AGX,

followed by a November 5, 2001 press release and related Form 8-K, filed with the SEC

on or about November 6, 2001 and signed by Riesenfeld, announcing the termination of

such merger discussions; (o) AGX's November 7, 2001 Earnings Release, in which

Legere was quoted and as to which he made public statements; and (p) AGX's Form 10-

Q for the Third Quarter of 2001, filed with the SEC on or about November 14, 2001 and

signed by Riesenfeld.

155.    Those misleading public disclosures contained numerous misstatements of

financial results and conditions, omissions of material adverse developments, and

63

misrepresentations regarding future prospects.  Nonexistent revenues and earnings were

reported; the demand for AGX's capacity was materially inflated; its cash flow problems

were concealed; the value of its assets was materially overstated; and it failed to disclose

that AGX entered into swap transactions for no purpose other than to generate materially

false revenues and thereby allow AGX to meet its projected earnings and artificially

inflate the value of AGX's securities.  Among other things, the Financial Impropriety

Defendants caused AGX to engage in the following improprieties:

       155.1   The Financial Impropriety Defendants caused, facilitated, and/or

allowed AGX to prepare and disseminate financial statements and pro forma disclosures

did not fairly and accurately present AGX's true financial results and condition.  <u>First</u>,

until at least the end of 2000, AGX's reported revenues and earnings were artificially

inflated as a result of AGX's improperly treating all or most of the IRU transactions it

entered into as sales-type leases in violation of GAAP.  <u>Second</u>, AGX reported revenues

and earnings that were artificially inflated as a result of the Company improperly booking

IRU swaps as cash sales, even though true cash income was not received and GAAP did

not permit such accounting treatment.  <u>Third</u>, this artificial inflation of reported revenues

and earnings was compounded by utilizing misleading, non-GAAP, pro forma

measurements to describe AGX's financial results.  <u>Fourth</u>, although AGX was

experiencing increasingly difficult cash flow problems, by reason of AGX's accounting

manipulations, this fact was masked.  Instead, AGX's financial statements conveyed the

false impression that AGX realized greater cash flow than was actually the case.

       155.2   The Financial Impropriety Defendants caused, facilitated and/or

allowed AGX's operating performance to be artificially inflated, until at least the end of

64

2000, by using improper accounting treatment for IRU transactions. Specifically, the

Financial Impropriety Defendants misapplied GAAP by treating all or most of the IRU

transactions it entered into as sales-type leases, and immediately reporting all of the

income received while amortizing the related costs over the course of the lease.

     155.3   The Financial Impropriety Defendants caused, facilitated and/or

allowed AGX's operating performance to be artificially inflated by using improper

accounting treatment for swap transactions with other telecommunications companies in

contravention of GAAP. Given the substance and effect of these swaps, as well as APB

No. 29, AGX should have accounted for these exchanges using its historical or cost basis

(rather than the "fair value"), and not recognized any revenue from them.

     155.4   AGX materially overstated the value of its total assets because

certain of the Financial Impropriety Defendants accounted for the value of IRUs acquired

from other telecommunications companies in reciprocal, or swap, transactions, using the

"fair value" of the capacity exchanged.

     155.5   The Financial Impropriety Defendants, among others, made

optimistic statements of growth and success that were misleading, in that such statements

failed to disclose that AGX's financial position was distorted by repeated and material

accounting manipulations; that AGX was increasingly relying on swaps to generate

illusory "accounting" revenues but not true cash income; and that AGX had not actually

generated hundreds of millions of dollars in revenues that it portrayed. To the contrary,

for a variety of reasons, AGX's business plan, as promulgated by the Financial

Impropriety Defendants, failed to generate adequate cash flow, and with the passage of

time AGX's future prospects grew increasingly clouded.

65

155.6   The Financial Impropriety Defendants caused, facilitated and/or allowed AGX to overstate the value of its assets.  For example, they caused AGX to overstate grossly the value of its interest in HGC.  That value was permanently impaired, among other reasons, by the decline in the prices for bandwidth capacity resulting in great part from the considerable growth in available bandwidth capacity.  Indeed, on August 30, 2002, as well as subsequent occasions, Global Crossing announced that AGX's interest in HGC would be written down by $450 million, representing the difference between (a) the proceeds received from the sale of that interest and (b) the value at which it was carried by AGX.  By not recognizing the impairment of long lived assets, and reducing the value of its interest in HGC, AGX violated GAAP.

155.7   The Financial Impropriety Defendants caused, facilitated and/or allowed AGX to understate the amount of capacity it needed to sell in order to pay off the cost of the construction of its network.  This was especially so when prices for bandwidth capacity declined in large part as a result of the considerable growth in available bandwidth capacity.

155.8   The Financial Impropriety Defendants knew, or should have known, that AGX's business plan was not fully funded because of the decline in wholesale bandwidth pricing and the existing glut of capacity.

**J.      The Fall 2001 Conflict Of Interest Issue And The AGX Demand For
Draw-Down On The $400 Million GX Line Of Credit Facility**

156.    In October 2001, two issues arose which pitted AGX's interests against those of Global Crossing -- (a) the issue whether to merge AGX with Global Crossing, and (b) the issue of whether to allow Legere, then AGX's CEO, also to become Global Crossing's CEO.  Given that Global Crossing sought to merge AGX into Global Crossing

66

and to have Legere as its CEO, any decision on those two issues required AGX's directors at that time to consider whether it was in AGX's best interests to do what was good for Global Crossing or to reject those alternatives because they were not in AGX's own interests to merge AGX into Global Crossing and/or not to allow Legere to serve simultaneously as CEO of both AGX and Global Crossing. Those AGX directors who also were directors of Global Crossing and/or had personal pecuniary interests in Global Crossing -- including, among others, defendants Legere, Winnick, Cook, Scanlon and Casey -- faced a conflict of interest in considering these questions.

157. Pursuant to his February 12, 2000 employment agreement with AGX, Legere owed AGX complete and exclusive devotion to his duties as AGX's CEO. Under that employment agreement, absent "consent of the [AGX] Board in writing to do otherwise," Legere was required to "devote all of his time and attention during the normal working hours of [AGX]" to "faithfully serve [AGX] to the utmost of his ability and [to] use his best efforts to promote [its] interests."

158. In the spring of 2001, Winnick had approached Legere about coming to work for Global Crossing. Legere declined, indicating that he was not interested in working for Global Crossing unless it was as Global Crossing's CEO. Then, during the summer of 2001, Winnick and Legere came up with a plan to merge AGX into Global Crossing and to make Legere head of the merged entity.

159. Toward that end, in September 2001, Legere completed the recruitment of Barney from WorldCom to meet anticipated objections from the AGX Board that Legere's becoming Global Crossing's CEO would hurt AGX. During Barney's recruitment, Legere promised Barney that, in the event Legere left AGX for employment

with Global Crossing, Barney would succeed him as AGX's CEO.  Barney was hired as

AGX's Chief Operating Officer on or about October 1, 2001, and his employment

contract stated that the only persons at AGX he would ever report to were AGX's then

CEO, Legere, or, if Legere were to leave AGX, the AGX Board.

160.    Having laid the groundwork for his becoming Global Crossing's CEO,

Legere, along with Global Crossing, requested the consent of the AGX Board to an

interim step -- to release Legere from his exclusive contract with AGX so that he could

become Global Crossing's CEO while he remained AGX's CEO.  The AGX Board

granted that request at its meeting on October 3, 2001, even though that left AGX with a

CEO who agreed to devote only 30% of his time to AGX matters, and even though

having a part-time CEO in a rapidly changing telecommunications market was patently

detrimental to AGX's interests, especially during a time when AGX was considering

whether to merge with the very entity with which Legere was committed to spend 70% of

his time.

161.    In order to obtain the AGX Board's permission to be released from his

exclusive contract with AGX, Legere promised the AGX Board that the rest of senior

management would remain intact and not follow him to Global Crossing.  But, within

weeks of giving that assurance, Legere began using defendant Higase, AGX's Vice

President -- Carrier Sales; defendant Ng, AGX Vice President, Greater China and

Customer Care; and defendant Christie, AGX's Vice President, Business Development

and Strategic Planning, on Global Crossing matters.  As time passed, these and other

AGX employees spent an increasing amount of their time working on Global Crossing

matters.  Yet, Legere made no effort to replace them or to have AGX compensated by

Global Crossing for their efforts on Global Crossing's behalf.  In soliciting those AGX

employees for Global Crossing work without reimbursement from Global Crossing,

Legere not only breached his promise to the AGX Board, but also breached his fiduciary

duties to AGX.

162.    In approving Legere's dual employment relationship with AGX and

Global Crossing, some of the Defendants who were AGX directors at the time --

defendants Winnick, Cook, Scanlon, and Casey -- also sacrificed AGX's financial

interests.  Among other things, AGX agreed to pay 30% of Legere's $1.1 million salary

and of his expected $1.375 million performance bonus (*i.e.*, $742,500) for 30% of his

time under the new sharing arrangement with Global Crossing, rather than $600,000 in

salary and a $600,000 bonus for 100% of Legere's time under the exclusive employment

arrangement with AGX.

163.    On or about October 4, 2001, Global Crossing announced (a) plans to

merge with AGX and (b) the appointment of Legere as its new CEO.  On or about

October 10, 2001, the AGX Board authorized formation of a special committee to study

the proposed AGX merger with Global Crossing.  Shortly thereafter, AGX bondholders

informed AGX of their objections to the merger and demanded that AGX draw down on

the $400 million GX Line of Credit.  The special committee decided that a merger was

not in AGX's interests.

164.    To review AGX's liquidity needs in light of the decision not to merge with

Global Crossing and to determine whether AGX should draw down on the GX Line of

Credit, the AGX Board formed a Special Independent Committee at its November 14,

2001 meeting.  Uncomfortable with the conflict of interest posed by considering that

C046038/0174188/1197160.1

issue, as to which AGX and Global Crossing had potentially adverse interests, a number of AGX's directors who also were Global Crossing directors -- such as Joseph P. Clayton, Steven J. Green, Mark Attanasio, Maria Elena Lagomasino, and William S. Cohen, among others -- resigned as AGX directors.  But others in the same situation -- such as defendants Legere, Winnick, and Cook -- continued to hold dual directorships and officer positions with both AGX and Global Crossing.  Moreover, those Defendants, as well as defendant Scanlon, continued as AGX directors despite their significant personal pecuniary interest in, and their conflicting fiduciary duties to, Global Crossing.

165.    On or about November 27, 2001, the Special Independent Committee asked Legere to provide his views on the draw down of the $400 million -- What were AGX's liquidity needs?  Was a draw down necessary?  If so, when should it be done and in what amount?  What was Global Crossing's financial ability to honor a draw down request?  Citing a conflict of interest arising out of his role as Global Crossing CEO, Legere refused to provide his views to the Special Independent Committee, contrary to his fiduciary duty to respond.

166.    On or about November 29, 2001, AGX's upper management described for the Special Independent Committee that in their view AGX had liquidity problems and that AGX would require $150-$200 million toward the latter part of 2002.  Despite Legere's conflict of interest, Legere claimed that the information provided by AGX's upper management was misleading and directed upper management to revise its views so that the Special Independent Committee was presented with one management view, *i.e.*, Legere's view that no draw down was necessary.

C046038/0174188/1197160.1

167.   On December 12, 2001, the AGX Board adopted the recommendation of its Special Independent Committee to draw down the full $400 million.  Eight days later, on December 20, Global Crossing refused AGX's demand.  It notified AGX that Global Crossing's financial condition did not enable it to lend any funds under the $400 million GX Line of Credit.  On December 20, 2001, the AGX Board formed a Special Committee for Restructuring Matters and shortly thereafter approved the hiring of bankruptcy counsel.  On December 27, 2001, AGX filed a formal "statutory demand" against Global Crossing in Bermuda for its failure to honor its obligations to lend AGX the $400 million.  By January 2002, AGX faced a worsening liquidity crisis.

**K**.      **Legere's January 2002 Termination And Compensation**

168.   In January 2002, the Special Committee for Restructuring concluded that AGX's need to pursue restructuring alternatives independent of Global Crossing required that AGX's CEO have financial interests and fiduciary duties that were tied exclusively to AGX.  It recommended to the AGX Board, at its meeting on January 9, 2002, that Legere be replaced as AGX's CEO.  At that meeting, Legere refused to resign voluntarily as AGX's CEO, insisting instead that his termination be involuntary and without cause so that he could get certain additional substantial financial benefits to which he was not entitled.

169.   Earlier in January, AGX's outside counsel had opined that under an involuntary termination without cause, Legere would be entitled to, among other things: (a) immediate forgiveness of the $10 million principal balance on the $15 million loan he had received upon his hiring as AGX's CEO in February 2000; (b) severance payments totaling approximately $3.3 million over the remaining term of his February 2000

71

employment agreement with AGX; and (c) his 2001 performance bonus.  At the same time, AGX's outside counsel opined that under a termination for cause, or a resignation in the absence of a "For Cause Event," Legere would be entitled to receive only his accrued but unpaid base salary and vacation through the date of termination; he would not be entitled to any severance, and the $10 million principal balance on his loan would become due and payable immediately on his termination or resignation date.

170.    At its January 9, 2001 meeting, the AGX Board considered whether to terminate Legere for cause or require his resignation.  Given what AGX's outside counsel concluded was an "unusually broad" definition of "cause" in Legere's February 2000 employment agreement, there were compelling reasons for the AGX Board to find that Legere should be terminated for cause by reason of the following:

a.    Legere violated the law and breached his fiduciary duties to AGX by encouraging swap transactions and participating in the financial misreporting that artificially inflated AGX's revenues and earnings and falsely presented to the public AGX's financial performance and condition;

b.    Legere breached his fiduciary duties to AGX in failing to disclose to AGX's Board Global Crossing's precarious financial condition in the fall of 2001;

c.    Legere breached his fiduciary duties to AGX in failing to describe for the AGX Board AGX's actual liquidity needs in or prior to the fall of 2001;

d.    Legere breached his fiduciary duties to AGX in seeking the consent of AGX's Board to his becoming Global Crossing's CEO in October 2001 under false pretenses and assurances, all as described more fully in the Counts against Legere set forth below, which are incorporated by reference herein;

e.    Legere breached his fiduciary duties to AGX in engaging in certain acts toward certain of the Debtors' female employees which (i) constituted sexual harassment of such female employees and/or created a hostile work environment for such female employees, and (ii) resulted in the Debtors' having to incur substantial

72

monetary settlement payments in August and September 2001 to
such female employees, as well as outside attorneys' fees, all as
described more fully in the Counts against Legere set forth below,
which are incorporated by reference herein;

f.  Legere breached his fiduciary duties to AGX in making
unauthorized "bonus" payments to defendants Higase, Ng,
Christie, LoBianco, and Milroy in the aggregate amount of
approximately $225,000, and then seeking to conceal such
payments, all as described more fully in the Counts against Legere
set forth below, which are incorporated by reference herein; and

g.  Legere breached his fiduciary duties to AGX in violating AGX
policy and California law when he spied without authorization on
the emails of Scanlon, Barney, Carroll, and others in December
2001 and January 2002, when the AGX Board was considering a
draw down on the GX Line of Credit, AGX's restructuring
alternatives independent of Global Crossing, and Legere's
termination, all as described more fully in the Counts against
Legere set forth below, which is incorporated by reference herein.

171.  Nevertheless, on or about January 9, 2002, the AGX Board decided to

terminate Legere without cause, thereby foregoing repayment of the $10 million balance

on Legere's loan and requiring AGX to incur purported severance payment and bonus

payment obligations to Legere in excess of $3 million.  The AGX directors who made

that decision -- including defendant Scanlon -- were unduly influenced by their

colleagues on the AGX Board who also were Global Crossing directors -- defendants

Winnick and Cook -- and, in the case of certain directors (including Winnick, Cook, and

Scanlon, among others) also were influenced by their own personal pecuniary interests in

Global Crossing.  Those AGX directors breached their fiduciary duties to AGX in

deciding not to terminate Legere for cause or to require his resignation.

L.      **The Truth About Global Crossing Comes Out**

172.    In January 2002, while extricating himself from AGX, Legere was

preparing Global Crossing for bankruptcy.  On January 28, 2002, Global Crossing filed

its petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

173.    Two days later, on January 30, 2002, *The Los Angeles Times* disclosed the

existence of the Whistleblower Letter and reported that during at least 2001 Global

Crossing was engaged in barter transactions on which it improperly recognized revenue

in violation of GAAP.

174.    Following the public disclosure of the Whistleblower Letter, the scope of

Global Crossing's fraudulent accounting slowly became known.  The United States

Attorney's office in Los Angeles began a criminal investigation into Global Crossing,

two separate Congressional committees scheduled hearings and demanded documents,

and the SEC launched its own investigation into the fraud.

175.    On August 2, 2002, the SEC announced its position on exchanges of IRUs

for telecommunications capacity.  According to the SEC, IRU capacity swaps consisting

of an exchange of leases should be accounted for under APB No. 29, using the historical

cost (as opposed to the "fair value") of the capacity exchanged -- which effectively meant

that neither party to the transaction could recognize any "revenue" as part of the deal.

The American Institute of Certified Public Accountants ("AICPA") announced the SEC's

action in a memorandum to its members:

> SEC Communicates Its Position on IRU Capacity Swap to SEC
> Regulations Committee
>
> August 2, 2002
>
> The SEC staff has communicated the following staff position regarding
> IRU Capacity Swaps to the SEC Regulations Committee:

The SEC staff has concluded that all IRU capacity swaps consisting of the exchange of leases should be evaluated within paragraph 21 of APB 29. That is, if a swap involves leases that transfer the right to use similar productive assets, the exchange should be treated as the exchange of similar productive assets, irrespective of whether the "outbound" lease is classified as a sales-type lease, direct financing lease or operating lease and irrespective of whether the "inbound" lease is classified as a capital lease or an operating lease. The staff believes that the lease classification criteria of FAS 13 are not an appropriate basis for an entity to "filter" a determination of whether the exchange involves similar productive assets. This conclusion is based on the thought that the right to use an asset, i.e., a lease, is in fact an asset and not a service contract, irrespective of whether such asset is recognized in a company's balance sheet.

This conclusion would require that IRU capacity swaps involving the exchange of leases be recognized based on the carrying value of the assets exchanged, rather than at fair value. The staff did point out that exchanges involving sufficient boot would still be treated as part monetary and part nonmonetary as per EITF 01-2 (EITF 86-29).

The staff expects that registrants will apply this guidance historically to IRU capacity swap transactions that occurred in prior years and, if appropriate, restate their financial statements. The CEO and CFO should be advised to give consideration to this matter prior to certifying the financial statements previously filed with the SEC.

176.   The SEC's position was an explicit confirmation of what had been required by APB No. 29 all along. The SEC was attempting to ensure that no one would ever again try to do what Global Crossing and AGX had done. According to pleadings filed in Other Lawsuits, some observers, like J. Edward Ketz, a professor of accounting in Penn State's Smeal College of Business Administration, publicly questioned whether there was even a need for the SEC's statement on IRU swaps: "Now in August of this year [2002] the SEC informs us that the telecoms should not be recognizing profit on these swaps of bandwidth (excepting in cases where cash is transferred). Why? Because these transactions involve similar assets! Like, duh! Any non-Arthur Andersen accountant knows that!"

75